## MUNDY et al. v. LOUISVILLE & N. R. CO.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1895.)

No. 201.

1. CONTRACTS—CERTIFICATE OF ENGINEER.

A provision in a construction contract that the engineer or architect of the owner shall finally determine, as between the contractor and owner, what work has been done, and the amount to be paid for it, is valid, and should be enforced, in the absence of fraud or palpable mistake.

2. SAME—FRAUD—EVIDENCE.

M. & Co. made a contract with the L. Ry. Co. for certain grading, under which they were to be paid at a certain rate for excavating earth, and at a much higher rate for excavating loose rock. The estimate of the engineer of the railway company was to be conclusive as to the classification of material, and the amount due. M. & Co. claimed that the engineer had classified certain material as earth which should have been classified as loose rock. The evidence as to the actual character of the material was conflicting, as was also the evidence as to statements claimed to have been made by the engineer to M. & Co., before and after the contract was made, as to how he would classify the material. *Held* that, upon the whole case, there was nothing to impeach the good faith of the engineer.

3. SAME—ESTOPPEL.

The contract provided that monthly estimates of the work done should be made by the engineer, and 90 per cent. of the amount appearing to be due should be paid to the contractors, and that at the close of the work a final estimate should be made by the engineer, who should not be bound, in making it, by the monthly estimates, and the balance then found to be due on the final estimate should be paid to the contractors. It was also provided that the contractors should assure the payment of the laborers, and, in case of failure, the engineer might arrange for their payment out of the sums due monthly. After certain monthly estimates had been made by subordinate engineers in charge of the work, the chief engineer expressed the opinion that such estimates were excessive, and would have to be reduced, but upon inquiry by the contractors, who informed him that they wished to avoid paying their subcontractors more than it might afterwards appear they were entitled to, the chief engineer assured the contractors that the reduction would not amount to so much, and they might safely pay the subcontractors. The contractors accordingly paid the subcontractors sums which exceeded by $12,114 the amount allowed on the final estimate to the months in question. *Held*, that the railway company, for which the engineer acted, was estopped to claim a reduction which would subject the contractors to loss.

4. EQUITY PRACTICE—FUND SUBJECT TO ATTACHMENT — PAYMENT INTO COURT.

The railway company objected to paying to the contractors the balance found due to them, on the ground that notices of attachments and assignments of the fund had been served upon it. *Held*, that the decree should provide that the fund might be paid into court, and that the railway company could protect itself by bringing in all claimants.

Cross Appeals from the Circuit Court of the United States for the Middle District of Tennessee.

This was a suit by J. A. Mundy, Jr., J. H. McTighe, and J. V. Hussey against the Louisville & Nashville Railroad Company to adjust the rights and claims arising out of a construction contract. From the decree entered by the circuit court, both parties appeal.

This is a controversy over the amount due the contractors under a railroad construction contract. The complainants, J. A. Mundy, Jr., a citizen of Virginia, J. H. McTighe, a citizen of Arkansas, and J. V. Hussey, a citizen of Tennessee, compose the firm of Mundy, McTighe & Co., who made a contract on July 7, 1890, with the Louisville & Nashville Railroad Company, a Kentucky corporation, for the grading of what is called the Clarksville Mineral Branch of the Louisville & Nashville Railroad, together with a branch of that branch, 6 miles in length, called the Vanleer Spur. The road projected and to be constructed extended 31 miles, from a point in Montgomery county on the Memphis Division of the Louisville & Nashville to a point in Dickson county on the Nashville, Chattanooga & Memphis Railroad. The Vanleer Spur, or branch six miles in length, left the main branch about 10 miles from the latter terminus, and ran to the Cumberland Furnace. The complainants constructed the entire line and the Vanleer Spur, except a division of 7 miles, from the fourteenth to the twentieth mile, inclusive. This middle division they cleared for grading, but were then notified by the company to do no further work thereon. Monthly and final estimates were prepared by the chief engineer under the contract, and the work, as done, was accepted by the company. The contractors refused to accept the final estimate, on the ground that they were not allowed therein what should have been allowed, in accordance with the terms of the contract, by $83,000. They filed a bill against the company in the chancery court of Montgomery county, at Clarksville, Tenn.; and this was removed, by petition of defendant for removal, to the circuit court of the United States for the Middle district of Tennessee. The bill attaches the contract under which the work was done, as an exhibit. In the contract were the following provisions: "The contractors further bind themselves * * * to promote good order among the laborers upon the

work embraced in this contract, by giving them assurance of the full payment of their wages." "It is further agreed that if, out of any monthly estimate paid to the contractors, they shall fail to pay the wages of the laborers for that month, it shall be at the discretion of the engineer thereafter to provide for the payment of the laborers for each month out of the estimate for the month, according to such rules as he shall prescribe. * * * It is further agreed that the amount of force employed by the contractors is at all times subject to regulations, and must be increased. or diminished as required by the engineer. * * * And it is distinctly understood and agreed between the parties that the work under this contract shall, at every stage of its progress,—from beginning to end,—be subject to the direction, inspection, and acceptance of the engineer, who shall determine what, in any case, a fair construction of the contract requires to be done by either party, and whose measurements, classifications, and estimates, monthly or final, shall be conclusive upon both parties, unless founded on fraud or mistake. * * * And the railroad company, in consideration of the full and complete performance of this contract, to the entire satisfaction of the engineer, to be evidenced by his certificate, agrees to pay to the said Mundy, McTighe & Co. the prices set forth in the schedule to the proposal of the said Mundy, McTighe & Co., a copy of which is attached, and which is to be taken and considered as a part of this contract, and to have the same effect as though inserted in it, to wit, on or about the first day of each month, during the progress of the work, the engineer shall make an estimate of the relative value of all the work done by the contractors for the month preceding, and on or about the 20th of the month 90 per cent. of such estimate shall be paid to the contractors at the office of the railroad company, in Louisville, Kentucky, in cash. And when all the work embraced in this contract shall have been completed agreeably to the specifications, and in accordance with the directions, and to the satisfaction and acceptance, of the engineer, there shall be a final estimate made of the quantity, character, and value of said work, agreeable to the terms of this contract; the balance appearing due to the contractors shall be paid to them upon their giving a release, under seal, to the railroad company, from all claims or demands whatsoever growing in any manner out of this contract. And in computing said final estimate, and giving his final certificate, the said engineer shall not be bound by any preceding estimates and certificates, but such preceding estimates and certificates shall be held to be only approximate to the final estimate; and the said monthly estimates and certificates on unfinished work shall in no case be taken as an acceptance of the work, or a release of the said contractors from responsibility therefor, until the final estimate is made, and the work, in its entirety, is accepted as complete under this agreement." In the general specifications appear the following: "Excavations will be classified under the following heads, to wit: Earth, loose rock, solid rock, iron ore, and excavation in water. Earth will include clay, sand, gravel, loam, decomposed rock and slate, stone and boulders, containing less than one cubic foot, indurate clay, cement gravel, and all other material of an earthly (sic) kind. Loose rock: All boulders and detached masses of rock measuring over one cubic foot, and less than one cubic yard; also slate, coal, shale, soft friable sandstone, and soapstone, and all other materials except solid sandstone and limestone in place, and those described above as earth; also stratified stone in layers six inches thick and under, separated by a strata of clay. Solid rock: All rock in place which rings under the hammer, in masses of more than one cubic yard, with the exception of stratified stone, described in the specification for loose rock. Borrow pits will be located by the engineer on land provided by this railroad company, and shall be excavated in conformity with such shape and to such depth as directed by the engineer; and all material so removed and placed in the embankment will be measured in accordance with actual sections of finished roadway and adjuncts. * * * In sections where the embankments exceed the excavation, the excess may be supplied from the sides of the adjacent cuts, or from such other places as the engineer may direct; but the excess so excavated shall be estimated as embankment only, and paid for as such. * * * Contractors must satisfy themselves of the nature of the soil; of the general forms of the surface of the ground; of the quantity of materials

required for forming the embankments or other work, and all matters which can in any way influence their contract; and no information upon any such matters derived from the maps, plans, profiles, drawings, or specifications, or from the engineer or his assistants, will in any way relieve the contractor from all risks, or from fulfilling all other terms of this contract."

The most important controversy between the parties is whether a material called "chert" should be classified as loose rock or earth, under the specifications. Complainants contend that it should be classified as loose rock. As they contracted to excavate loose rock at 39 cents a yard, and earth at 13½ cents a yard, it will be seen that the difference was very material. The bill averred: That before the complainants made a bid they went over the projected line, and then asked the engineer how he would classify chert. That he replied that there was but little on the line; that, if any was found, he would classify it as loose rock. That after the contract was signed he again promised so to classify it. That, notwithstanding these statements, he directed his assistant engineers not to classify it as loose rock; and, when they had classified a percentage of it in this way in monthly estimates signed by him, he, knowing that he was doing the complainants gross injustice, arbitrarily and fraudulently cut down the amount of loose-rock excavation in his final estimates so as to reduce the sum earned by complainants more than $10,000 below that which was allowed in the monthly estimates. The bill also averred that, in the same manner, the chief engineer cut down the measurements or quantities of excavation and embankment shown in the monthly estimates, without any sufficient examination or measurement by himself. An amendment to the bill averred that, by a custom prevailing with reference to the classification of material under these railroad-construction contracts, the engineer exercised an equitable discretion to classify as loose rock material not strictly within the words of the specifications, but which, because of the difficulty of excavating it, should be paid for at the same rate, but that the engineer in this case arbitrarily and fraudulently refused to exercise any such discretion. The bill further averred that the "defendants knew that complainants had subcontractors on parts of this work; that these subcontractors were paid monthly for the work done by them according to the estimate made monthly, less a retained per cent. held by the defendants. They were often paid directly by the chief engineer from the monthly estimates given complainants, and complainants had a right to presume that on a final estimate they would be allowed a larger amount than was given in the monthly estimates. On the contrary, however, and as stated, they were cut down by the said chief engineer. By the monthly estimates they were induced and compelled to pay their subcontractors the parts they were entitled to receive of the monthly estimates for the work done by them, and, if the final estimate of the chief engineer is permitted to stand, it will leave the subcontractors largely indebted to complainants; they having already received more than the engineer now says they were entitled to receive for all the work done by them," by some $12,000. The answer contained specific denials of the averments of the bill that Cobb had ever agreed to classify chert as loose rock. It set out, by way of explanation of the reduction of the final estimate below the monthly estimate, that one of the assistant engineers admitted that there were grave errors in his measurements and classifications, requiring a complete remeasurement and reclassification, which showed a gross excess in both. Upon the question of overpayments by complainants to subcontractors due to the excessive monthly estimates, the averment of the answer was as follows: "Respondent does not know positively, but believes and charges, that no overpayments were made by complainants to subcontractors until complainants had notice of the errors in classification and measurements on the sections upon which corrections were made. But, however this may be, the contract provides that the monthly estimates should only be approximate, and subject to correction, and by reason of this provision the complainants are precluded from a recovery against respondent on that account. Again, respondent believes and charges that complainants well knew all the while that the classifications on said sections were in violation of the contract and the instructions of the chief engineer, and for that reason there can be no recovery for any alleged overpayments to subcontractors."

The answer also averred that the complainants had acquiesced in and accepted the chief engineer's classification of the chert as the greater part of it earth. "Respondent again shows to your honors that the contract provided that the railroad company should, during the progress of the work, pay complainants only 90 per cent. on the monthly estimates, reserving the rest until its final completion. Several times during the progress of the work, with a full knowledge of the character of the classification being made, and the construction given the contract by the chief engineer, complainants, being in need of further payments to meet demands against them, applied for and received advances upon the retained per cent., and never once did they intimate to respondent that anything was due to them as now claimed, but they always applied for and received said payments as advances upon the retained per cent." Finally, the respondent, in the answer, objected to the payment of the sum admitted to be due the complainants under the final estimate some $5,000, because it had been attached in the hands of the respondent company by creditors of complainants, and because it had been assigned by them to others, who had served notice of the assignment upon respondent.

Leech & Savage, for complainants.

Burney & Gholson, for defendant.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts). The controversy which the complainants seek to make in this case is whether proper measurements and classifications of the excavation and embankment done by the complainants under the contract entitle them to recover a large sum from the railroad company. One of the terms of the contract is that the measurements and classifications of the chief engineer of the defendant, as contained in his final estimate, shall be conclusive of the amount to be paid by the company to the contractors, in the absence of fraud or mistake. It is conceded by both parties that the amount due according to the final estimate has been paid to the contractors, or their order, except $5,531.03, and this sum the company expresses its willingness to pay to those who may be now entitled to have it. The authorities leave no doubt that construction contracts, in which the contractor stipulates that the engineer or architect of the owner shall finally and conclusively decide, as between him and the owner, what amount of work has been done, and its character, and the amount to be paid therefor under the contract, are legal, and should be enforced. In such cases, after the work has been done, the contractor can recover nothing in excess of the amount found due by the engineer, unless he can make it appear that the engineer's decision was fraudulently made, or was founded on palpable mistake. Railroad Co. v. Price, 138 U. S. 185, 11 Sup. Ct. 290; Railroad Co. v. March, 114 U. S. 549, 5 Sup. Ct. 1035; Sweeney v. U. S., 109 U. S. 618, 3 Sup. Ct. 344; Kihlborg v. U. S., 97 U. S. 398; Fox v. Railroad Co., 3 Wall. Jr. 243, 9 Fed. Cas. 627 (Case No. 5,010); Lewis v. Railroad Co., 49 Fed. 708; Ranger v. Railway Co., 5 H. L. Cas. 72; Waring v. Railway Co., 7 Hare, 482; McIntosh v. Railway Co., 2 De Gex & S. 758; Hill v. Railway Co., 11 Jur. (N. S.) 192; Scott v. Corporation of Liverpool, 28 Law J. Ch. 230; Herrick v. Railroad Co., 27 Vt. 673; 2 Wood, R. R. 1138 et seq., and cases cited.

The fact that the contract at bar expressly stipulates that the decision shall not be conclusive in case of fraud or mistake does not vary its construction. The exception would be implied, if it were not expressed. The result is that, before the complainants can establish their right to recover any sum over and above that allowed in the final estimate, they must show that the engineer, in making his estimate, was guilty of fraud, or exhibited such an arbitrary and wanton disregard of the complainants' plain rights under the contract as to be the equivalent of fraud, or committed errors and mistakes to the complainants' prejudice so gross and palpable as to leave no doubt in the mind of the court that grave injustice was thereby done to them. We proceed to examine the chief circumstances upon which the complainants rely to make such a case. The chief engineer was Capt. Cobb, of many years' experience in railroad engineering, and quite familiar with the country through which the line projected was to be built. His brother-in-law, Capt. Gracey, was interested in having the road built, both because it was supposed to be of advantage to Clarksville, where he lived, and because he owned an iron mine which would be reached by the new line. He showed his interest by subscribing $10,000 for its construction. Cobb made the usual preliminary estimate of the amount of the necessary work and its cost, before the bids were taken. It is urged on behalf of complainants that Gracey's interest in securing the construction of the road led Cobb to make an unreasonably low estimate in order to induce the Louisville & Nashville Company to undertake the enterprise, and that, having reported such an estimate, he had a strong motive to vindicate his estimate by making the subsequent cost square with it. This is one of those circumstances proper to be considered in weighing evidence adduced to establish fraud, which derives importance from the necessity, if any exists, for explaining the subsequent conduct of the person charged. It suggests a motive for unjust action. That is all. The particular conduct of Cobb, the good faith of which has been chiefly attacked, was his classification of the material called "chert" by the complainants, and the first circumstance relied on by complainants is the statements of Cobb as to how he would classify this material before and after the contract was made. It might be significant of a fraudulent purpose on his part if he deliberately agreed to classify a certain material as loose rock before the bids were made, to induce low bids, and subsequently gave it the much less lucrative classification of earth. But what does the evidence show? Cobb had been engineer in the construction of a railroad in Alabama called the "Birmingham Mineral," where, under a similar contract, he had classified a material which was there called "chert" as loose rock for McTighe, one of the complainants, who was there the contractor. McTighe expressed the opinion to Cobb, after he had gone over the Clarksville Mineral line, that the same material would be found on it, and asked him how it would be classified. Cobb said he did not think the Birmingham chert would be found on the Clarksville line, but that if it was it would be classified as loose rock, as it was at Birmingham. Clearly there was no deception here,

unless the fact is that the Birmingham and Clarksville materials are identical. There is a conflict upon this point, but the great weight of the evidence shows a marked difference between the two. Again, it is charged that Cobb frequently agreed, during the progress of the work, to classify this so-called chert as loose rock. The evidence in regard to these statements is quite conflicting, and yet the differences are not incapable of reconciliation. J. H. McTighe, one of the complainants, was their chief witness. He says that the word to "classify" a material is to place it either in the loose-rock or solid-rock class; that when any material is to be treated as earth, under the specifications, it is not called "classified material." His further examination disclosed that when a percentage of a material was put in the loose-rock class he considered it classified. There is no doubt that the contractors were constantly complaining of the difficulty of excavating this chert, and insisting to Cobb that it should be classified as loose rock. There is no doubt, also, that Cobb agreed to give them a fair ·classification. They probably understood this to mean that he would give them a classification by which a good percentage of the chert should be rated as loose rock. Cobb testifies that he said he would give them a fair classification under the specifications. McTighe admits that he frequently referred to the specifications as his guide. Other witnesses for complainants say that he only assured them that they would not lose money by the work. Cobb says that especial complaint was made of the classification of Neblett, assistant engineer in charge of the south-end division or residency and the Vanleer Spur, and that he agreed to go over the work, and himself classify the material; that he did so, and raised the percentage of loose rock,—a statement which does not seem to be contradicted in the record. On the whole case, we think it reasonably clear that Cobb's assurances to the contractors were that he would give a reasonable and fair classification of the material, rather than that he would give them any specific percentage of loose rock. The extravagant statement of the bill, and of one or two of complainants' witnesses, that he agreed to classify all chert as loose rock, falls of its own weight, and is entirely at variance with the course of the complainants in continuing the work under estimates from month to month in which a large per cent. of the chert was classified as earth. Cobb admits that he instructed his assistants that they should classify nothing of the chert as loose rock, except so much of it as was boulders, or detached masses of rock measuring over one cubic foot in size. This is said to be a gross violation of complainants' rights under the contract. "Earth" was defined by the contract to be "clay, sand, gravel, loam, decomposed rock and slate, stone and boulders containing less than one cubic foot, indurate clay, cement, gravel, and all other material of any earthly kind." "Loose rock" was defined to be "all boulders and detached masses of rock measuring over one cubic foot, and less than one cubic yard; also slate, coal, shale, soft friable sandstone, and soapstone, and all other materials except solid sandstone and limestone in place, and those described above as earth; also stratified stone in layers six inches thick and under, separated by

strata of clay." Now, if this chert, so-called, was made up of boulders or pieces of rock mixed in with clay, decomposed rock, or other material of an earthy kind, then the earthy material was to be classified as earth, and boulders or detached rock masses or stones were to be classified as earth or loose rock, as each boulder or mass of rock was less or greater in size than one cubic foot. If chert did not contain earthy material in any substantial quantity, then, under the residuary phrase of the loose-rock clause, it should have been classified—all of it—as loose rock. What, then, was this Clarksville chert? There is much evidence in the record to show the difficulty with which it could be worked. Except as this may reflect on the question whether the material is earthy, or not, it has no relevancy to the discussion. There is nothing in the contract authorizing the court or the engineer to classify material according to the difficulty of handling it. It may have been—it doubtless was —the intention of the parties so to define the classes of material that the earth class should contain materials more easily excavated than loose rock, but we must presume that, for the very purpose of avoiding a discussion as to difficulty in handling, specific description of the different materials was inserted. The weight of the evidence shows that a large part of the so-called chert was of earthy material, as defined by the contract. The witnesses for the company say that the material is made up of clay in which are mixed boulders or pieces of flint varying much in size. Several witnesses for the complainants say that the material is rotten or decomposed limestone, with flint masses interspersed through it. Now, rotton limestone seems to be included in the term used in the earth clause of the contract "decomposed rock." But it is not material how the weight of the evidence may be upon this point, unless it shall appear that it is so overwhelmingly with the complainants as to give reasons for thinking that Cobb's judgment was biased, partial, and consciously unjust. The parties agreed that Cobb should decide this very point. He has decided it. When it appears that the evidence to sustain his conclusion is strong and creditable, the fact that the court might, by a nice weighing of all the evidence, reach a different conclusion, is not of importance. Having, with good reason, decided that chert was largely composed of earthy material, his instructions to his assistants not to classify any chert as loose rock, except that part of it composed of boulders or detached masses of rock exceeding one cubic foot in size, were in accordance with a proper and legal construction of the specifications, and cannot now be made the subject of complaint. Much was said in the brief and argument of counsel for complainants concerning a custom prevailing in the execution of such railroad contracts as this one, by which the engineer exercises an equitable discretion in his classification to depart from the letter of the specifications, and to allow the contractor quantities of material under the higher classes based on the difficulty of the work. That evidence of custom may be introduced to show authority of an agent, or to throw light upon the construction of a contract, is well settled. Before it can have any effect, however, the evidence must disclose a custom reasonable, notorious, and well

defined.    Insurance Co. v. Waterman, 6 U. S. App. 549, 4 C. C. A. 600, 54 Fed. 839.    And no custom is permitted to prevail over the express words of the contract.    Smith v. Society,[1] 65 Fed. 765.    We think the evidence relied on does not show a certain and well-defined custom, and that the custom claimed is in conflict with the terms of the written contract.    Of course, the classification of material cannot be mathematically exact, in the construction of railway works.    The engineer must use his judgment or discretion in estimating the percentage of loose rock or earth in any excavation; but that he may, under the terms of a contract like the one here, deliberately ignore the specifications, and substitute for them loose and undefined considerations of equity and justice, in fixing the amount to be paid for different materials, cannot be conceded.    But suppose such a custom were to prevail; it would amount only to a permission to the engineer to depart from the specifications, or not, as he should deem proper; otherwise it would not be a discretionary power.    How can the contractors complain if, in the exercise of such discretion, he adheres to the specifications?

Another circumstance relied upon by the complainants to show that the final estimate of Cobb should not be regarded as conclusive is that he made a material reduction in the measurements, and a material change in the classifications, as they appeared in the monthly estimates for July and August.    Each monthly estimate contained a statement of the entire work done under the contract, in units of quantity and class, from the beginning.    Deducting the amount shown in the previous monthly estimate gave the work done during the current month.    The record shows that the amount of work credited to the contractors by the estimate given at the end of July, 1891, was greater in money value by some $20,000 than that allowed in the final estimate; and this although the work done in August, 1891, to complete the job, was not inconsiderable.    This calls for explanation.    The line was divided into three residencies or divisions.    The south end and the Vanleer Spur were in charge of Assistant Engineer Neblett.    The north end was divided between Assistant Engineers Grundy and Mills.    When the July estimate was returned, Cobb says that he became convinced that the loose rock returned on the north end was an overclassification. He thereupon went over Grundy's residency with him, and in detail discussed his classification, learning from him that he had not adhered to the specifications, in deciding what was to be classed as loose rock, but had exercised what he regarded as an equitable discretion  to soften the harshness of the specifications in the contractor's favor.    He returned 55,608 yards of loose rock and 102,581 yards of earth excavated on his residency.    Cobb reduced the loose rock to 29,585 yards, and increased the earth to 128,331,—a reduction in money earned by the contractor of about $6,565.    In the case of Mills, Cobb went over his division with him, and in comparing amounts, Mills admitted that he had overclassified the loose rock in the "big cut" which was on his residency, and that he had

[1] 13 C. C. A. 284.

given Cobb the wrong amounts, in calling his figures for loose rock. It turned out, moreover, from Mills' own written confession, that he had destroyed his own note book, because it would not verify his returns, and that he was unable to make a correct final estimate. Cobb then took Grundy, and went over Mills' division himself, made all the measurements, and reclassified the work, and made his final estimate. Complainants employed two engineers to go over the work, to make measurements and classifications; and their figures, as a whole, greatly exceed Cobb's. The company also employed two engineers to go over the work, and their measurements and classification are quite far below Cobb's. The latter make two estimates, the one based on a strict classification, according to the specifications, and the other on a so-called equitable classification, in which the definitions of "earth" and "loose rock" in the contract are not exactly followed. Both estimates show much less money earned by the contractors than Cobb's final estimate.

On the whole case, there is nothing at all to impeach the good faith of Cobb in making his final estimate. He did say to the contractors that he would recommend the payment of some $16,000 more than his final estimate by the company to them, because the specifications worked harshly against them, on condition that they would accept it as a finality. He says this was in accordance with his practice of requiring the contractors to live up to the specifications, and of then relieving them from any hardship by recommending to the company the payment of a lump sum in addition to the estimate made according to the contract,—a practice much more reasonable and safe than the one which the complainants here seek to establish as a custom. The contract specifically provided that the engineer, in making his final estimate, should not be bound by quantities in the monthly estimates; so that, in revising the entire work, Cobb was only doing what the contract contemplated; and, as no bad faith or palpable error appears in his measurements and classification, we think that the final estimate must be regarded as conclusive, except in the respects now to be discussed.

In the course of the work, Mundy, one of the complainants, who was also a subcontractor, absconded, leaving many creditors. Complainants gave a chattel mortgage to secure a considerable indebtedness. Both occurrences led to attachments and injunctions, which much embarrassed complainants in the fulfillment of the contract. In an adjustment between the attaching creditors, the company, and the complainants, it was arranged that Cobb should draw the amount due on each monthly estimate, and then pay out the same to the subcontractors, material men, and other creditors, on the order of complainants. This was done. It was very important to the company that the subcontractors and laborers should be paid, so that the work might progress, and several provisions of the original contract were evidently inserted to prevent interruptions from a failure of the principal contractors to pay their debts. Thus the principal contractors, to promote good order among the laborers, bound themselves in the contract to give assurance to the laborers

of full payment of their wages. It is further provided that if, out of any monthly estimate paid to the contractors, they fail to pay the wages of the laborers for that month, it shall be at the discretion of the engineer thereafter to provide for the payment of the laborers for each month out of the estimate for the month, according to such rule as he shall prescribe. When the July estimate was made up by the assistant engineers, and signed by Cobb, he expressed the opinion that it was an excessive allowance, and would have to be reduced. This came to the ears of the contractors, who visited Cobb, and said that they did not wish to give orders in favor of subcontractors on the basis of a monthly estimate, when, by a final estimate, it might appear that they had paid more than the subcontractors were entitled to. Cobb says he was then of opinion that the reduction could not be enough to lead to such a result, assured them of this, and even guarantied that Guinn and Shippey might safely be paid some $2,500. It also appears that he thought the August estimates would have to be reduced, and that he then had reasonable ground to suspect that Mills' work was wholly unreliable. Nevertheless, he went on with payments to subcontractors on the orders of the principal contractors to the extent of $12,114.72 more than his final estimate showed to be due to them from the principal contractors. Some question is made of the sufficiency of the evidence to show that the overpayments by the complainants to their subcontractors amounted to so large a sum. McTighe, who testifies positively to the sum above stated, gave details in respect to but two or three of his subcontractors,—presumably, because he was not inquired of as to the rest. The sum overpaid to these particular subcontractors was only about 25 per cent. of the amount stated by him to be the aggregate of complainants' overpayments. He was not cross-examined upon the subject, and no ground appears for discrediting his positive testimony concerning the aggregate amount. The engineer by the provisions in the contract, and by the subsequent arrangement between the company, the complainants, and their creditors, was given authority to act for the company in securing payments by the complainants to their subcontractors and laborers. When, therefore, he gave the complainants assurances that the monthly estimates would not be so reduced by the final estimate as to make it possible that payments to their subcontractors on the basis of the monthly estimates should turn out to be overpayments, the company became estopped to claim such a reduction of the monthly estimates as would subject the principal contractors to loss thereby.

It is suggested that the principal contractors knew of the overclassification and overmeasurement. There is nothing to show this. They claimed then, and they claim now, that justice was not done them, even in the monthly estimates, in respect either of classification or measurement.

Again, it is pressed upon us that in returning the final estimate the engineer was an arbitrator; that he did not more represent the company than the contractor in making it; and, therefore, that the company could not be estopped by his act in the capacity of arbi-

trator, any more than a party to a lawsuit could be estopped by a misleading judgment of a court, which the same court should subsequently reverse. It may be doubted whether the engineer occupies the position of indifference between the parties which this argument assumes. In a leading case in England (that of Ranger v. Railway Co., 5 H. L. Cas. 72), a controversy arose as to the conclusiveness of the decision of the engineer of the company upon a disputed point arising in the execution of a construction contract, by the terms of which the engineer was finally to decide it. It was sought to impeach the decision on the ground that the engineer was a shareholder in the company. The House of Lords held that this could not be done, because he did not hold an indifferent position between the parties, and they both knew this when the contract was made. He was not a judge, but the representative of one party, in whose decision the other had been willing to acquiesce, and had stipulated to do so. Of course, such a stipulation carries with it an implied condition that the agent of the company shall be guilty neither of fraud nor gross mistake; but, by his assumption of a quasi judicial function, his employer does not cease to be responsible for his acts in that capacity, because it is well settled that his failure to act, or his fraud in acting, estops the company from relying on the condition of the contract that money shall only be due under the contract upon his certificate. Waring v. Railway Co., 7 Hare, 482; McIntosh v. Railway Co., 2 De Gex & S. 758. We are clearly of opinion that the respondent company is estopped to claim any reduction from the July and August estimates which will involve the contractors in loss due to the making of payments to subcontractors on the basis of the monthly estimates. It follows that on this account the complainants are entitled to recover $12,114.72.

It appears to be conceded that, by a mistake, the complainants were not allowed, in the final estimate, $170 for clearing the middle division of the line, upon which their work was subsequently stopped, and $675.42 for extra work not covered by the contract. Only $200 was claimed for extra work in the bill; but the complainants should have leave from the circuit court to amend their bill to accord with the undisputed evidence.

The amounts due the complainants, therefore, are as follows:

| | |
|---|---:|
| Due by final estimate | $ 5,531 03 |
| Clearing | 170 00 |
| Extra work | 675 42 |
| Overpayments to subcontractors | 12,114 72 |
| | $18,491 17 |

These amounts should bear interest from the date of the final estimate. It is claimed by the respondent company that notices of attachments and assignments served upon them make it dangerous for them to pay this sum to complainants. They may be protected by bringing in all persons claiming an interest in the fund as parties to the action; and the decree to be entered below should provide that a payment of the sum due into the registry of the court, with interest until the day of payment, will satisfy the same. The de-

cree of the circuit court is modified in accordance with this opinion. The costs of appeal will be divided. The costs in the circuit court will be taxed to the railroad company.