FRUIN–BAMBRICK CONST. CO. v. FT. SMITH & W. R. CO.

(Circuit Court, W. D. Arkansas, Ft. Smith Division.    September 11, 1905.    On Motion to Reopen Case, December 7, 1905.)

1. CONTRACT FOR RAILROAD CONSTRUCTION—PROVISION MAKING ENGINEER UMPIRE.

A contractor for railroad construction under a contract which provides that the decision of the chief engineer of the railroad company shall be final and conclusive upon any question arising thereunder is bound thereby, and cannot recover any sum in excess of that allowed in the final estimate of the engineer, unless it is shown that in making such estimate he was guilty of collusion or fraud, or exhibited such an arbitrary and

140 F.—30

wanton disregard of the contractor's plain rights under the contract as to be equivalent to fraud, or committed errors or mistakes to the contractor's prejudice so gross and palpable as to leave no doubt in the mind of the court that grave injustice was done him.

2. SAME—CONSTRUCTION OF SPECIFICATIONS.

A provision of the specifications in a contract for railroad construction that "solid rock" shall include "all other material which in the judgment of the engineer cannot be moved without being blasted" is to be given a reasonable construction with reference to practical railroad construction, and solid rock may thereunder include material which can be moved without blasting, where such mode of moving it would not be practical.

3. SAME—FRAUDULENT ACTION OF ENGINEER—IMPEACHMENT OF ESTIMATE.

Evidence considered, and *held* sufficient to establish collusion and bad faith on the part of the chief engineer of a railroad company in making the final estimate of construction work done by a contractor, such as to entitle the contractor to show the incorrectness of such estimate, although by the terms of the contract it was made final and conclusive on both parties. The evidence also *held* to show that a change in the classification of certain of the work by the engineer from that made by his predecessor, who died after the work was completed, was erroneous and not made in good faith, and should be set aside, and the first classification restored.

4. DAMAGES—TIME PENALTY—WAIVER.

Where a contract for the construction of a railroad imposed a penalty of $100 per day for delay beyond a time fixed for the completion of the work, the company, by taking possession of the road and running trains thereon for commercial purposes before it was fully completed, waived such penalty for the time thereafter before its completion.

5. SAME—INTEREST.

Where the chief engineer of a railroad company dishonestly and fraudulently delayed giving a contractor a certificate of the completion of the work, required by the contractor before final payment became due or suit could be brought, the contractor is entitled, on recovery, to interest on the amount found due him from the time when the certificate should reasonably have been given.

In Equity.

This is a suit brought by the Fruin-Bambrick Construction Company (hereafter, for brevity, called the "Construction Company"), against the Ft. Smith & Western Railway Company (hereafter, for brevity, called the "Railroad Company") upon a contract for the construction of about 120 miles of the railroad of the latter, beginning at section 77, on the Canadian river, in the Indian territory, and extending west to section 193 (both inclusive), at Guthrie, Okl. The contract on which the suit is brought is the ordinary railroad construction contract, differing (as they all do, so far as the court has observed them) in some details, and covers the grading, masonry, and trestle bridging. The contract is badly drawn, and in some respects indefinite, calling for care in its construction. It contains the following sections:

"(7) The aforesaid party of the second part hereby agrees that whenever this contract shall be completely performed on the part of the said party of the first part, and the chief engineer has certified to the same in writing, the said party of the second part shall pay to the party of the first part for all materials and labor furnished under this contract at the prices hereinafter set forth, first having deducted the amount of all previous payments and the amount of all claims against said first party as specified in paragraphs four (4), eight (8), nine (9), and ten (10) of this agreement, which the second party may have paid or which remain unsettled at that date; it being expressly understood and agreed between the parties hereto that all monthly or progress estimates which may be made from time to time as the work progresses are only approximate, and will not govern or affect in any way the

amount of the final estimates as made by the chief engineer after the completion of the terms of this contract. * * * This agreement is based upon the rates and prices as set forth in the proposition of the party of the first part hereto attached and forming a part of this contract."

"(13) And it is mutually agreed that the decision of the chief engineer shall be final and conclusive on any dispute which may arise between the parties to this agreement relative to or touching the same; and each of said parties does hereby waive any right of action or other remedy, in law or otherwise, by virtue of said covenants, so that the decision of the said engineer shall, in the nature of an award, be final and conclusive on the rights and claims of said parties."

The chief engineer made his final estimate under section 7, and it is assailed by the bill as grossly erroneous and fraudulent. The provisions above quoted are pleaded by the defendant, and the allegations of gross error and of fraud by the chief engineer are denied. The contentions of the parties mostly grow out of the classification of material on sections 107, 108, and 120, and the proper construction to be placed on certain provisions of the contract. True, there are other contentions; but they will sufficiently appear in the opinion. The specifications (which are made part of the contract) contain the following provisions:

"(17) Excavations in earth will generally be taken out twenty (20) feet in width at subgrade, with side slopes of one (1) horizontal to one (1) vertical, unless otherwise instructed by the engineer in charge. Earth excavation shall embrace all excavated material not included in the class loose rock or solid rock.

"(18) Loose rock excavation, unless otherwise instructed by the engineer in charge, will be taken out the same width and with the same slopes as excavation in earth. Loose rock shall comprise all boulders and detached masses of rock measuring over one cubic foot and under one cubic yard in bulk, and all hard and tough cemented gravel, slate, coal, and soapstone; also stratified stone in layers of six inches and under separated by layers of earth. When required by the engineer, excavations in loose rock will be taken out one (1) foot below subgrade, and filled in again with material suitable for roadbed.

"(19) Solid rock excavation shall be taken out twenty (20) feet wide at base, with slopes of one-quarter ($\frac{1}{4}$) horizontal to one (1) vertical. Solid rock shall comprise, first, rock in solid beds or masses, in its original or stratified position; second, boulders or detached masses of rock exceeding one (1) cubic yard, and all other material which, in the judgment of the engineer, cannot be moved without being blasted. Solid rock excavations will be taken out one (1) foot below subgrade and filled in again with suitable material for roadbed. All excavations will be taken out true to slopes and grades; i. e., no projection will be allowed beyond the true plane of the slopes."

"(24) Classification. There will be no classification of material of any kind other than earth, loose rock, and solid rock, as provided for in these specifications."

The contract also contains the following typewritten provision:

"(8) If the work to be done or material to be furnished by the first party for the second party, as provided for in this contract, be not furnished, finished, and completed to the satisfaction of the chief engineer within the time provided in this contract for the furnishing or completion of the same, or within such extended period as may be granted to the first party therefor in writing by the chief engineer, under the provisions hereof, then the first party shall forfeit and pay to the second party, or its assigns, as liquidated damages for such failure and default, the sum of one hundred dollars per day for each and every day during which such default shall continue, which sum shall become payable immediately, and shall be in addition to all sums retained from the estimates of the first party for such damages as provided in section ten (10) of this contract."

H. C. Mechem, Ira D. Oglesby, and Hamilton Grover, for complainant.

A. C. Dustin, C. E. Warner, and Read & McDonough, for defendant.

ROGERS, District Judge (after stating the facts). The depositions in this case contain more than 1,700 pages of typewritten matter, and the exhibits, books, correspondence, maps, and other documents in evidence contain much more. The argument occupied more than a week. No general discussion of the facts will be attempted. The volume of the record does not admit of it. I shall content myself with a statement of the conclusions reached as briefly as possible, having regard to the nature of the case, referring to such of the evidence as may be necessary.

First. The case is embarrassed by the fact that Frederick W. Bond, the chief engineer of the railroad company at the time the contract was made, died before it was completed, and the railroad company then employed as chief engineer H. A. Schwanecke. At the time Bond died the grading was all done, and the classification and estimates were all made by the resident engineers, and the records were on file in Bond's office. Copies of these had been furnished the complainant, with the money values extended. It is contended that Bond's successor had no right or power, under the contract, to remeasure, reclassify, or re-estimate the work of his predecessor, but that Bond's work was final and binding on both parties, except for gross error or fraud. The contention is not tenable. Schwanecke had all the power and authority under the contract in making the final estimate which Bond would have had if he had been alive; and it seems clear that while some of the graduation estimates returned by the resident engineers to Bond's office were marked "final," or "final as to graduation," and the money values ascertained and extended in Bond's office and copies thereof sent to the complainant, these estimates were not final, within the meaning of the seventh clause of the contract, supra, which expressly provides to the contrary. The case must therefore proceed, so far as Schwanecke's power and authority under the contract in making the final estimate is concerned, as if he had been the chief engineer from the beginning.

Second. It is no longer an open question in the United States courts that where parties enter into an agreement like that contained in the thirteenth paragraph of the contract sued on, whereby the chief engineer is empowered to decide and his decision is made final and conclusive as to any dispute which may arise between the parties to the agreement relating to or touching the same, such an agreement is binding on the parties, and the courts will enforce it.

Third. The result is that before the complainant can establish its right to recover any sum in excess of the sum allowed in the final estimate of Schwanecke, the chief engineer, it must show that the latter, in making his final estimate, was guilty of collusion or fraud, or exhibited such an arbitrary and wanton disregard of the complainant's plain rights under the contract as to be equivalent to fraud, or committed errors or mistakes to the complainant's prejudice so gross and palpable as to leave no doubt in the mind of the court that grave injustice was done it. Mundy et al. v. L. & N. Railroad Co., 67 Fed. 633, 14 C. C. A. 583; Lewis v. Chicago, S. F. & C. R. Co. (C. C.) 49 Fed. 708. Choctaw & Memphis R. R. Co. et al. v. Charles M.

Newton, as Receiver of the Magoon Construction Co., et al. (C. C. A. 8th Circuit, May Term, 1905) 140 Fed. 225.

Fourth. After a careful and painstaking investigation of the record I have concluded that the final estimate of Chief Engineer Schwanecke must be set aside and the estimate corrected in several particulars:

(a) The grubbing of 6¼ acres on section 77, off the right of way, for which the complainant claims pay as extra work, and was allowed by Chief Engineer Bond and paid, was subsequently, on making the final estimate, arbitrarily disallowed by Chief Engineer Schwanecke on the sole ground that it was forbidden by the terms of the contract, or by the terms of the contract no pay was to be allowed for "grubbing in borrow pits." This construction of the contract was, in the opinion of the court, clearly and palpably wrong, and the disallowance grossly unjust to the construction company. Section 16 of the contract reads as follows:

"Grubbing will be required the whole width between slope stakes in excavation and in embankments where three feet or less in height. Stumps and grubs to be removed. No allowance will be made for grubbing in borrow pits."

But "borrow pits" under the contract were defined by the contract itself, and were limited to the right of way. See section 22 of the contract. It is not disputed that the grubbing done, and for which Bond in his April estimate made the complainant an allowance of $500, was for grubbing the 6¼ acres of land (at the price agreed on in the contract), and was entirely off the right of way. The grubbing was done to get sufficient dirt to construct the embankments of the road. The place from which it was taken was not a borrow pit at all, within the meaning of the contract, and none of the requirements of the contract as to the location, construction, and drainage of borrow pits were applicable to the place where the grubbing was done. No one can read the twenty-second section of the contract (see especially last paragraph), and the deposition of McNair, one of the defendant's resident engineers, and that of Martin, vice president of the construction company, in regard to the disallowance, without instinctively concluding that Schwanecke's action in disallowing it was arbitrary, without legal right under the contract, and palpably and grossly unjust, proceeding, it may be possible, from carelessness or gross negligence in the examination of the contract itself. Schwanecke's estimate must be corrected in this regard, and the allowance of $500, made by Chief Engineer Bond to complainant in his final estimate, restored to the contractor.

(b) I have concluded that Schwanecke's reclassification of sections 107, 108, and 120 should be set aside. The reasons therefor will now be stated as briefly as possible. A most significant fact, to begin with, is that of all the work done on this 120 miles of road Schwanecke, after investigation, never disturbed (and therefore approved) the measurement and classification of his predecessor, except as to these three sections. This statement should be qualified to this extent: That he examined several other sections, and made a slight reduction, inconsequential, as to one, and did not disturb the other. Why should Bond's graduations and classifications on all the rest of the

120 miles of road be approved, and these three sections, to which Bond's attention was specifically called at the very time the work was being done, be rejected? The signficance of this inquiry is emphasized when we remember that Engineer Evans, who is not contradicted, says that similar material on the same road was classified as solid material, just as it was on these sections. The testimony is absolutely without question that Bond was a man of eminent ability in his profession, and a man of high character for integrity, while his correspondence between the officers of the railroad company and his subordinates along the line, and the construction company, is absolutely free from any suspicion of want of moral courage in dealing with the construction company, its subcontractors, or his own subordinate engineers, and alike free from the slightest taint of disloyalty to the railroad company or of a disposition to deal either partially, unjustly, or arbitrarily with the contractors. His letters are models of candor, frankness, moral courage, ability, and uprightness, and disclose a strong sense of obligation to duty. This does not, of course, exclude the possibility of errors in his estimates and classification; but it goes far towards establishing strong faith in the correctness of his measurements and classifications and estimates. His measurements and classifications and estimates for graduation work on the sections in controversy were all on file in his office, and with one exception approved, before his death. No contention is made that either the depositions, the field books of the engineers, their estimates or measurements, or the records of Bond's office disclose any evidence of collusion or concealment in any respect. The only irregularity complained of—i. e., failure to take and preserve the end areas of the sections from which the cubic yards of the different materials could be calculated, as required by the contract—was apparent on the face of the books of Turner and the records of Bond's office, and, if Bond's classification of the material was correct, resulted in no substantial wrong to the railroad company. The construction company was not at fault at all in this regard, and neither party was injured by it. The time in which the construction company was required by the terms of its contract to complete its work was May 1, 1903. All the grading and masonry work was done at that time; but the trestle work was uncompleted on a considerable part of the road. The construction company was, therefore, in default on May 1, 1903. Necessarily a controversy would arise when the contract was completed and the day of settlement arrived. Bond did not die until July 12, 1903. Before his death A. C. Dustin, president of the railroad company, had written Bond the following letter, foreshadowing trouble:

"Cleveland, Ohio, June 20th, 1903.

"Mr. F. W. Bond, Chief Engineer, Ft. Smith, Ark.—Dear Sir: Of course, none of us could figure against the tremendous freshets that have literally deluged the whole Southwest, and I assume that Fruin-Bambrick were interfered with in their work the same as we were. I want to call your attention to several things:

"First. The trestle structure which you assured me had the piles sunk in 18 inches of rock went out in this freshet. I do not think they were in rock at all, and it seems to me that the Fruin-Bambrick Co. should replace this trestle.

"Second. The Fruin-Bambrick Company have had ample time to get the trestles in the neighborhood of Warwick, Wellston, etc., in such shape that we will not be delayed one minute with our track construction when we reach them. I rely on you to see that this is done.

"Third. You will please issue no certificate of any kind, of completion of road, or otherwise, to Fruin-Bambrick until the question of final settlement with them is taken up by me. When their contract is finished, I propose to take up with you the question of final adjustment on a fair and equitable basis; but they certainly have not done right under this contract, and I therefore do not want our position sacrificed or prejudiced by the issuance of any official documents or receipts by our engineering department.

"This of course is not intended to interfere in any respect with the monthly estimate the same as heretofore.

"Very truly yours,                                    A. C. Dustin."

It thus appears that as early as June 20, 1903, Dustin had prejudged the construction company, and notified Bond, the chief engineer of the railroad company, not to issue the certificate of the completion of the road which the contract required him to issue upon its completion, and also announced his purpose not to take up the question of settlement with the construction company, but to take up the matter of the settlement with the construction company with Bond. Bond was not, therefore, to be left to exercise his unbiased judgment as to when the certificate should be issued and what the estimate should be; but he was required to take the matter up with his superior in office, without issuing any certificate of any kind. It does not appear that Bond ever answered this letter, or what view he took of this direction to him by his superior. Such was the condition of things when Schwanecke became chief engineer on August 10, 1903. He says himself as soon as practicable after he became engineer he familiarized himself with the records and correspondence in Bond's office, admitting directly that he read this letter soon after he became engineer. It must have been obvious to any intelligent man, careful of his own good name, from the very start, that Schwanecke's position was a delicate one, and that his action, whatever it might be, so far as it might affect a change of the status of the contracting parties when he took charge, should be taken after careful consideration, and every change made in the work of his predecessor safeguarded by the fullest investigation and fairest opportunity to both sides, to know the grounds or views on which it was made. He was bound to know, when he began the remeasurement of these sections, that they had been previously measured as the work progressed, under the supervision of his predecessor, and with his approval. He knew also, when he began the reclassification, that the work had been all previously classified under the division and resident engineers, and under the personal supervision of his predecessor, to whom the parties had agreed to submit their differences for final adjustment, and in whose capacity and integrity both parties had reposed their confidence. He knew that the matters then in dispute—this very work of reclassifying sections 107, 108, and 120—was to be ultimately settled by him as Bond's successor. He knew, when he began the work of reclassifying these sections, that the contracting parties were not only in dispute, but suit had been actually brought. He knew that Bond's division and resident engineers had

seen the work while in progress, and that Bond himself had seen it from time to time as it was in progress, and that all the men engaged on the work were familiar with the nature and character of the material and how it had been removed; and he could have easily ascertained that the contractor, when the work was begun, had at that time taken the advice of the resident and division engineer, and they in turn had called that very matter—the classification of the blue and yellow material—to the attention of Bond, and that he had gone on the work himself, at their instance, and examined the material, saw how it was worked and how it was necessary to work it, and had classified it as solid rock.

But it should not be overlooked that, long before Schwanecke began the examination of the cuts on sections 107, 108, and 120, he had some understanding with Mr. Dustin, the president of the railroad company, as to the policy to be pursued in order to force a settlement with the construction company. The measurements for reclassification did not begin, according to Schwanecke's and Westbrook's evidence, until late in December, 1903—about Christmas. In a letter to Schwanecke, dated September 28, 1903, Dustin followed up his instructions to Bond about not issuing a certificate of the completion of the work, cautioning Schwanecke to "please bear in mind the precaution not to give such an estimate (for September work) as that they (the construction company) can claim it has the effect of a final estimate." "Bear in mind the precaution" simply means "don't forget your previous instructions," etc. On November 6th Dustin wrote Schwanecke in response to a telegram that the construction company had requested payment on account, "which I do not intend to make until I know how we can agree on final settlement question. Payment on account is for executive department. No objection to your having interview with him [Swift, president of the construction company], but your position that you cannot give estimate until through checking is entirely proper. "By this letter Schwanecke was advised of the impending controversy and of the course Dustin had mapped out. The idea was, "No more pay until I get a settlement." The same day, November 6, 1904, Schwanecke wrote Dustin, advising him that Swift had wired asking an interview, and that he had answered saying that he would be glad to see him, but preferred that he would wait until he got further along checking up the work, and then adds:

"Mr. J. J. Mahoney, Gen'l Manager, leaves today, and says he can't stay over, as I wished he could, to be present at the meeting, which I do not desire to take place without him or you present. But I can't refuse to see him. Of course, I don't know whether he will come or not. Mr. Mahoney says he left everything connected with the case in your hands, and washes his hands of it, and advised against the course pursued by you, although I am quite sure I am measuring sections now in accordance with his suggestion as directed by you when here last. I find that the F. B. Const. Co. has not settled with all their subcontractors by a good deal, as was Mr. Mahoney's opinion when you were here. I think you are on the right course to get a settlement, and will keep you advised. Mr. Mahoney also says he had a letter from Swift wanting some back money, to which he did not reply.

    "Yours respectfully,          H. A. Schwanecke, Chief Engr."

November 24, 1903, Dustin wrote Schwanecke as follows:

Cleveland, Ohio, Nov. 24th, 1903.

"Mr. H. A. Schwanecke, C. E., Ft. Smith, Ark.—Dear Sir: I wish you would let me know about when you can finish the measurements which Mr. Mahoney has requested to have done on Fruin-Bambrick's work. I do not think they should have a final estimate until you are able to make it a complete estimate; in other words, there is nothing in the contract that contemplates anything but partial estimates and a complete estimate. The partial estimates have now all been made. The complete and final estimate will have to include the grading and bridging, as finally settled upon by you. In view of the language of the contract (see paragraph 7), this final certificate will need to be drawn with a good deal of care. I rather think, from your former letters, that you will not have these measurements in shape, before I reach Ft. Smith the early part of next month.

"Very truly yours,                A. C. Dustin, President."

I have set out the above facts, about which there is no substantial controversy, and quoted from the above letters, which speak for themselves, that it may appear what the conditions and circumstances were, and what the understanding between Schwanecke and Dustin was, and what Schwanecke's frame of mind and object was when he set about remeasuring the material taken from the cuts on 107, 108, and 120; for it will be borne in mind that the remeasurement of Schwanecke on these cuts discloses no substantial difference from Bond's measurements as to the cubic yards removed. Not a word is said in these letters about reclassification. It is the "grading and bridging" that Schwanecke was expected to settle at the time this letter was written, and not the reclassification. But the remeasurement, having failed to disclose any substantial error in Bond's estimate, failed of its purpose. There was no grading to settle. A few days after this letter was written an effort was made to settle the differences between the contracting parties, and, that having failed, Schwanecke had now recourse to the reclassification of the material on those same cuts. How did he go about it? He procured some section hands, and caused to be dug what he called "test pits," or holes, at intervals in the sides of the cuts on 107, 108, and 120; these test pits being in the nature of stair steps, from one to four feet in depth, generally about two to three feet, and running from the railroad track up the sides of the cuts to the surface. This was done in December, 1903. The excavation of these cuts was completed on the 1st of May, 1903, and much of them had been exposed for months previous thereto. When this was done he called in a consulting engineer, Daniel Bontecue, and they visited the cuts and spent an hour or two in each cut, examining the test pits; and it was upon this superficial examination that Mr. Schwanecke made his final report, wherein he reduced the estimates of his predecessor something over $16,000 by a reclassification of the blue and yellow material of those cuts. This examination by Schwanecke and Bontecue was purely ex parte. The construction company had no notice that it was being made, and no chance to contradict the truth of the evidence of Schwanecke and Bontecue—no opportunity to explain or state what, if present, they might have seen in regard to the test pits, or as to the fairness of the places chosen for the examination. They were not even advised that the material in these cuts was being ex-

amined for reclassification. Common fairness and a decent regard for the rights of the construction company required a totally different procedure; and a different procedure was essential in order that the examination should carry full credit.

It was said at the argument that the construction company might, at any time since, have pursued a similar procedure, and had other persons to witness and testify as to the result. True; but the construction company already had all the knowledge that could be acquired as to the nature and character of the material at issue, and it had also numerous witnesses who had acquired like information, not by an ex parte investigation, but by observation and experience in the progress of the work, running through many months. This evidence was alike accessible to both parties, and was within the possession of both parties. It might have gone, it is true, and dug test pits and caused others to examine them, just as Schwanecke did; but the conditions would always be different from those when Schwanecke made his examination. What the construction company had a right to, in all fairness, was to be allowed to be present with engineers selected by it, who could see, and testify to what they saw, when Schwanecke made his examination on which his final estimate was based. It was unfair and unjust to the construction company that Schwanecke should make an examination, months after the work was completed, which was to affect its rights, without giving it an opportunity to be present and witness all that was done. Such an examination carries with it a purpose of wrongdoing, and does not commend itself to the conscience of a chancellor. But, as stated, the Schwanecke estimate was based on this ex parte and superficial test, made months after the work was done, and the information on which it was based was known only to him and Daniel Bontecue, whom he called in as a consulting engineer. I am constrained to say that Bontecue's evidence is, in my opinion, almost without probative force. His testimony was evasive, disingenuous, and contradictory. He attempted to explain his contradictions; but he wholly failed. His explanations were as embarrassing as his contradictions. I think he was completely trapped by counsel in the cross-examination by the production of the record in another case in which he, as an expert, had, upon similar facts, given an expert opinion directly the reverse of his opinion in this case; and in the opinion of the court he was clearly right in his opinion in the other case, and palpably wrong in his opinion in this case. In substance, he testified that an engineer, competent and experienced, could make just as safe and accurate a test of the material in controversy, in the way it was done by Schwanecke, months after the work had been completed, as he could if he had been on the work during its progress and witnessed what was done and how it was done. I do not quote his language, but that is its effect and the impression he intended to make. I think his testimony was palpably untrue, and that he knew better, because in the other case he testified directly to the contrary. I attach no credit whatever to his evidence, and the case, therefore, would have been stronger without his evidence than with it. There is no need of false evidence to uphold a good case. Westbrook, who made the measure-

·ments for Schwanecke, also testified; but his evidence did not go further than to show that he could see no powder disturbances where the test pits were dug, except in one instance, and there was no disintegration of the shale at that point. He did not testify as an expert, although he was a civil engineer of several years' experience. The men who assisted him in making the experiments were also called as witnesses; but they were not experienced or experts, and their evidence was immaterial so far as the question of classification is concerned.

The defendant produced another witness, James Mallory, an employé engaged in bridge construction work on its line, who testified that he had railroaded from Maine to the Argentine Republic, and had found the material in controversy in nearly every road that he had been on; that it was indurated clay; that he had, while this suit was pending, made an examination of the material in the cuts in controversy; that in one place he had dug back horizontally eight feet, and down six feet with a pick; that there was a perceptible difference in the hardness of the material after getting away from the distintegrated surface. He testified that the material could be moved with a pick, and says it should be classified as loose rock. He sustains Bontecue in the opinion that one not present when the work was done had just as good an opportunity to judge of the material as a man on the work, if he had experience in similar material. He also says he did not let the construction company, or any one connected with it, know that he was going to make the experiments. This witness, manifestly, has had a large experience in railroading; but we are not advised, from his evidence, whether it was as an engineer, a brakeman, a conductor, a bridge-builder, or a section hand. Whatever his experience may have been, he was not an expert, and could only tell what he saw and what he knew, and not what he thought. It made no difference, under the contract in suit, whether the material was indurated clay, or shale, or any other material. That was not the test, and it may be that it might have been removed by a pick, and still, in practical railroad construction, should have been classed, under this contract, as solid rock. The test in this case is in the contract, which says that:

"Solid rock shall comprise, first, rock in solid beds or masses, in its original or stratified position; second, boulders or detached masses of rock exceeding one cubic yard, and all other material which, in the judgment of the engineer, cannot be moved without being blasted."

The test, therefore, was whether the material in controversy, in the judgment of the engineer, could be removed without being blasted. This provision must be construed with reference to what was contemplated by the parties. Marble in great masses might be removed without blasting, but only at enormous cost, labor, and delay. The parties, however, contracted for the building of 120 miles of railroad, and the language used should have a reasonable meaning, having regard to what was usual and practicable in railroad construction, or what was contemplated by the parties. If it was such material as it was impracticable to remove in railroad building by plow, or by picks, or by shovels, and which could only be removed in a practical way by blasting, it should be classified as solid rock, under this specification; and

although it was a matter of judgment upon the part of the engineer as to whether that could be done or not, the judgment which was invoked was an unbiased judgment, an honest judgment, and not one influenced by any duress, or collusion, or dishonesty.

C. W. Fenn, a civil engineer of experience, and apparently fair-minded and honest, was also called by the defendant as a witness. He knew nothing of the material in controversy, and based his classification on what had been told him (by whom, or what had been told him, does not appear), and also upon what he knew by experience of similar material found along the lake shore in Ohio. He admitted that shale, and all rocks, differed in hardness, and had seen shale that had to be blasted. His evidence, I think, was quite as favorable to one side as the other, in view of the evidence of other witnesses familiar with the material.

Such is a brief résumé of the evidence offered to sustain the Schwanecke final estimate. I now notice the procedure of Mr. Schwanecke before and after the examination was made, as appears from his own correspondence and his own evidence. November 6, 1903, Schwanecke had written Dustin:

"Mr. Mahoney says he left everything connected with the case in your hands, and washes his hands of it, and advises against the course pursued by you, although I am quite sure I am measuring sections now in accordance with his suggestions as directed by you when here last. * * * I think you are on the right course to get a settlement, and will keep you advised."

Not a word in this letter about reclassification. Measurements for reclassification did not begin till late in December, about Christmas; but he was measuring them as Mahoney had "suggested" and Dustin "directed." It appears, therefore, that Dustin had mapped out a course, and Schwanecke knew what it was and approved it, and was proceeding along that line, and to give assurances to Dustin he promised to keep him advised. November 9, 1903, Dustin had written Schwanecke for advices as to when he would have the Fruin-Bambrick Construction Company's work checked up and figured out. Nothing is said in this letter about remeasurement or reclassification. He does in the same letter express a desire to see the form of certificate for a final estimate, and speaks of the sale of the bonds, so he could pay the construction company by the 10th or 15th of December. November 26, 1904, Schwanecke writes Dustin:

"Our position is quite correct, while he [meaning Swift] is all wrong. I really don't know what he means. He says all our engineers will testify for him. It seems our engineers had more the contractor's welfare at heart than the company's who employed them. I expect you and I will have to fight it out without the co-operation of any one else."

This letter indicates that Schwanecke's interview with Swift about a settlement had resulted in friction, and that he had been advised by Swift that the engineers under Bond were not standing by the company that employed and paid them. It also gave assurance to Dustin that, however that might be, he (Schwanecke) had not forgotten by whom he had been employed. Did Schwanecke intend that it should be inferred that he thought the relation of master and servant implied that the latter should both labor and swear for the former? Surely

this record discloses no evidence that Schwanecke himself failed in either respect, and the sentiment of the letter itself indicates that it would be unsafe to treat its author as one that "sweareth to his own hurt, and changeth not."

It would seem that information that all the railroad engineers, presumably informed of the facts touching the construction of the road, would testify against the railroad company, was of itself a fact of sufficient importance to stagger, ordinarily, a fair-minded man, and cause him to question the correctness of the information that he had received as to the inaccuracy of Bond's measurements and classifications, and which information, he admits, had biased his judgment in favor of the railroad company. But not so with Schwanecke. The engineers selected by him were then remeasuring the cuts on 107, 108, and 120, and no expression of doubt escaped his lips that the result would not turn out favorably to the company. On the contrary, in the absence of the information to be derived from the remeasurement by his own chosen engineers, whose work, then uncompleted and which finally, when completed, disclosed no substantial variance from the measurements made under Bond, and notwithstanding he had written Dustin in a previous letter that "Mr. Mahoney says he has left everything connected with the case in your hands, and washes his hands of it, and advised against the course pursued by you, although I am now quite sure I am measuring sections now in accordance with his suggestion as directed by you," he unhesitatingly announces: "I expect you and I will have to fight it out without the co-operation of any one else." In Schwanecke's mind whether the fight was to go on is not made to depend on the results of the remeasurements of his engineers, or the truth of the facts as they might be made to appear; for he had in the same letter, without the measurements or the facts announced: "Our position is quite correct, while he [meaning Swift] is all wrong." The course to be pursued was to fight it out anyhow, even if no aid was to be expected, except from Dustin. It seems to me that the spirit then possessing Schwanecke, who was not a court, or even an arbitrator, technically speaking, but whom the law compelled to act honestly, justly, and fairly between the parties under the contract, was not such a spirit as fitted him to discharge his duties uprightly. Indeed, under the circumstances, it would be closely akin to a miracle if he had reached a correct result.

November 26, 1903, Dustin writes Schwanecke again to know when he will have the measurements Mahoney had requested of the construction company's work completed, and cautions him about the final estimate, which should include grading and bridging, and then he concludes by saying:

"I rather think from your former letter that you will not have these measurements in shape before I reach Ft. Smith the early part of next month."

Evidently the servant was not being hurried by the master. Nothing in this letter about remeasurements or reclassifications. Early in December, following the interview between Swift and Schwanecke, an effort was made between the railroad company and the construction company to settle. It failed, and immediately suit was brought. Schwan-

ecke says there was nothing in the correspondence between himself and Mahoney, the general manager, or Dustin, the president, of the railroad company, about reclassification until after the suit was brought; but he thinks Mahoney mentioned it to him in the latter part of September and October, and reclassification was determined upon in October. Who by, or at whose suggestion, or for what reason, other than Mahoney had expressed dissatisfaction, does not appear. He also says he did not give the construction company any certificate of the completion of the work on the 20th of November, although he knew at that time that the work was completed, because he thought the certificate called for by the seventh clause of the contract was the certificate to be given on the final estimate. He might have added, as an additional reason, that both he and Bond had been instructed by Dustin not to do that very thing. It was a part, no doubt, of the course mapped out to force a settlement. It seems clear, however, that the certificate of the completion of the work is an entirely different thing from the final estimate. The one enabled the contractor to know when the work was completed, and that he was at liberty to go to other things without being called upon to do more; the latter simply advised it of the financial status between the railroad company and itself. The one was to be given on the completion and acceptance of the work by the engineer; the other depended on the adjustment of the accounts between the contracting parties under the various provisions of the contract. The one could be given the moment the engineer was advised of the completion of the work; the other required time to make calculations, the settlement with subordinates and others under the contract, and according to Schwanecke, the adjustment of the damages to be allowed for failure to complete the work on time, and possibly many other things. The one fixed the period when the contractor's money was due (although the amount was to be subsequently determined); the other determined the amount due, and was binding on both parties, except for fraud, collusion, or mistake.

On December 8, 1904, three days after suit was brought, Schwanecke wrote Mahoney:

"Will you kindly give me an order to section foremen to dig test pits on sections 191, 192, 120, 107, and 108."

This is the first intimation of reclassification found in the record, except what Schwanecke said Mahoney told him. Following up the facts already recited, on the 3d of February, 1904, Schwanecke wrote Dustin that Warner, the counsel for the railroad company, had shown him a letter of Dustin's where he speaks of damages, and adds:

"I will hold that open until you come here, which he says will be next week. I had to send the engineer out again to get some additional classifications and check some measurements over."

Why hold the question of damages over until Dustin came? At that time the construction company had no notice that Schwanecke was even making an estimate, or that any question of damages was involved; but he was, and Dustin was to be present before the

damages were determined. What for? By what right was Dustin to be present, and not the construction company, when the estimate was to bind both parties? Schwanecke says on the 27th of February, 24 days later, he gave notice to the construction company that on the 10th of March, 1904, he would "take up, determine, and render final estimate." Up to the time this notice was given there is not in this record a word of evidence showing that the construction company had any knowledge of Schwanecke's doings in regard to the final estimate, or that he intended to reclassify any part of the work. On the contrary, he had been distinctly notified, as he himself testified, that the construction company did not desire any remeasurement or reclassification, unless subcontractors called for it, and that Swift had denied his right to do it, and expressed a willingness to abide by Bond's measurements and classifications. On the 20th of February, 1904, Schwanecke had written Dustin as follows:

"February 20th, 1904.

"A. C. Dustin, Esq., President Ft. S. & W. R. R. Co., Cleveland, Ohio.— Dear Sir: All the checking of the quantities was finished last Wednesday. Mr. Boles is making a clean copy of estimate, and in checking has found a mistake which has not yet been found. The total amount of estimate is practically the same as I told you when here. Total estimate in round figures, $1,136,559.00. October estimate, on which the contractors sued, was $1.156,-640.58. Amount paid, $1,040,983.72; retained, $115,664.86; balance, $95,575.40. I saw attorneys twice, and they will give me form of certificate next week. They seem to be undecided as yet when to take testimony of our engineers. I will have work for them yet the coming week, and maybe by that time the contractors will have filed their amended bill. I am not at all well, having trouble with the grip for two months, until it has affected my head.

"Yours respectfully,          H. A. Schwanecke, Chief Engr."

These figures correspond to a dollar to the amount which Schwanecke found as the balance due the construction company in his final estimate, subsequently made out, before he deducted therefrom certain items, including amounts due from the construction company to the railroad company, and the penalty of $100 a day under the contract; and this fact appears in his final estimate. He had, therefore, made this estimate and notified Dustin of his finding a week before he ever gave the notice to the construction company that he would "take up, determine, and render final estimate" on the 10th of March. The final estimate was therefore practically made, and Dustin notified, before the construction company was even notified they could be heard. The suit was then pending (prematurely brought, no doubt), and it was pending when Schwanecke began his measurement for the reclassification, and every step from that time which Schwanecke took, and even for some time before, was under the advice and with the full knowledge of Dustin, the president of the road, who is also a lawyer and the leading counsel in the case; and yet all that was done by Schwanecke in the making of this estimate was done and taken secretly, so far as the construction company was concerned. At least, it was ex parte and without any knowledge on their part; and that, too, notwithstanding this estimate, then being made, was by the terms of the contract to be binding on the construction company. The construction company disregarded the notice, and did not appear to

take any part in making up an estimate, whereupon Schwanecke joyfully hastened on the following day to write Mr. Dustin the following letter:

"Ft. Smith, Ark., March 11th, 1904.

"Mr. A. C. Dustin, President, Cleveland, Ohio—Dear Sir: The hearing pulled off yesterday all right. The contractors did not appear. Our attorneys have not yet been able to take testimony from our assistants, as Mechem said contractors wanted to be present and could not come before the 14th. I have not yet received form of certificate from Mr. Warner and he informs me he is awaiting further information from you. The testimony taken yesterday will be in my hands tomorrow, so the stenographer tells me.

"Yours respectfully,       H. A. Schwanecke, Ch. Engr."

It will be remembered that the differences between the construction company and the railroad company were never formally submitted to Schwanecke for settlement. He simply considered what he pleased, so far as they were concerned, and in the end did practically all that Dustin claimed or desired, so far as the proof shows. On the undisputed facts now stated, I cannot escape the conclusion, however disagreeable it may be, that this estimate, thus made by Schwanecke, was the offspring of bad faith and collusion, and ought not to receive the sanction of a court of conscience, unless, upon the whole record, it appears clearly right. I now consider the evidence directed against the final estimate of Schwanecke, so far as it effects the classification of sections 107, 108, and 120.

First. It should be noticed that the defendant did not call a single witness of all its engineers, the contractors, and others employed in the construction of the road. Two of the resident engineers, the proof shows, were in the courthouse, or in the city, while the proof was being taken, and no effort was made to secure the evidence of the others, although some effort was made to get an explanation from Turner, one of the resident engineers. It may be it had been ascertained definitely (presumably so) that, if called, their testimony (as Swift had advised Schwanecke in November, 1903) would have been in favor of the contractor.

Second. Bond's estimate and classification, in view of the undisputed character of the man, as shown by the evidence, for candor, integrity, and ability, is to be considered as strong evidence against the railroad company, whose agent he was. Indeed, he was their alter ego, so far as this work was concerned, and what he did bound them, in the absence of fraud or mistake.

Third. · First, in their order, A. L. Philips testified that he was one of the division engineers on this road while it was under construction; had been a civil engineer 20 years; knew Bond and his reputation as a civil engineer and for integrity, and both were excellent; that he was familiar with the topography and character of the soil in the Indian and Oklahoma territories, and had frequently come in contact with blue shale, and was familiar with it; that it was not as hard as sand or limestone, is found in layers, and the strata differ in thickness and hardness; that it is too hard to plow, and a certain amount of explosives are obliged to be used to scatter it; when exposed to the elements it decomposes and becomes a mass of putty; that he located the line through sections 107, 108, and 120, but was not at

those points when the road was under construction, and had seen blue shale, cemented gravel, slate, and soapstone that could be removed with a pick and plow, and some that could not be moved in that way; there was a blue shale along the line of the Ft. Smith & Western Railroad similar to that found in Oklahoma and other parts of the territory; there would be no comparison between the judgment of a man as to classification who was in charge of the work and one who goes on afterwards, for the reason that the one on the work knows how the material had been handled, while afterwards, however competent, its character could not be determined; had encountered soapstone, slate, and cemented gravel that the plow would not enter after the surface was removed; that the only method of getting a fair classification after the work is done is to open up a trench adjacent to the cut and work it out, and that such trench should be at least 50 feet from the cut, and that a fair test could not be made of the side of the cuts by going 3 or 4 feet in the side, as the material decomposes after exposure to air and water; fair classification can be had in some classes of material, as for instance, rock formations not subject to the action of the elements.

J. F. Hinckley says he has been an engineer 34 years; knew Bond; had been associated with him at different times in many capacities for 24 years, and that his reputation for ability as an engineer and integrity as a man were good; had had large experience in railroad building in the Indian and Oklahoma Territories, having constructed 1,200 miles in those territories, and during that time had come in contact with blue shale; had examined the contract sued on, and the blue shale should be classified under it as solid rock; that a cut through blue shale could not be classified as correctly 4 months after material was removed, because the line of demarkation between the dirt and the shale would be mixed because of water getting in seams, and cracks made by powder, and it slacks so you can take it up and dissolve it in your hand, whereas, when first uncovered, it was solid rock; disintegration from atmospheric action begins after being exposed for 30 days. No proper classification could be made by test pits two or three feet deep in the side of the cut; test pits should be beyond the influence of explosives; usually depends upon the quantity of the material; had seen powder cracks 30 or 40 feet from the side of the slope; that 40 feet would be a safe distance; that a cut containing blue shale could not possibly be classified after material was removed 4 months; that he did not believe any engineer could go there and make test pits, and determine whether the material had been disturbed by powder, unless he was there to see whether it could be moved without blasting. He also says that the chief engineer should have a man on the work to determine the classification, and when he had made his report and the chief engineer had made the calculations and sent them out, that while such action would not debar either party from asking reclassification, that he would not pay attention to a request of that kind unless both parties demanded it, on account of fraud or something of that kind.

140 F.—31

D. J. Griffith, who was one of the contractors on this work, and had been a contractor for 24 years in the Indian and Oklahoma Territories, and Kansas, Nebraska, Iowa, and Illinois, testified that he saw the work on cut 120; that the cut was 800 or 900 feet long and 23 feet deep; that 2 feet at the top was soil and loose gravel, and then shale, 2 feet of which could be moved with plows and scrapers, and after that the material, which was blue shale such as he had found in Oklahoma, could not be removed without blasting; that it was removed with powder and dyamite, and could not be removed otherwise; that when the blue shale was found he called the resident engineer's (Mr. Watkin's) attention to it with a view of its classification, and Watkins refused to act without consulting the division engineer, Mr. Otis, and both of them examined it, and the division engineer ordered it recrosssectioned as solid rock. Bond told him no change would be made in the classification of that section, and with that assurance he had settled with his subcontractors and paid them the retained percentages, and that the construction company had settled with him on the same basis; that to reclassify this material after 4 months the engineer should go far enough to avoid the effect of explosions, say 15 to 30 feet from the slope; that shale is harder than slate or soapstone generally, not always; that the resident engineer, before the work was done on this section, decided that it should be blasted; that he thinks it took 600 kegs of powder and 3,500 pounds of dynamite to remove the material in section 120.

W. H. Evans testifies that he had been in engineering work for 8 years on railroads; that he was rodman under Watkins, the local engineer on the cut on section 120 in question; was there when part of the west end of the cut was removed, and after they stripped it they found hard slate of grayish color; that he observed the progress of the work and material, and that it could not be removed with a plow; that it was hard, and it had to be shot; that the same material, when he had worked on this very road and on the Suburban road at Ft. Smith, was removed by blasting and the material classified as solid rock; that he helped cross-section this particular cut, and one-third of the material was down to grade before he left the work.

J. S. McNair testified that he was a civil engineer, and had been for 30 years, and had worked on 16 or 17 different roads in different states, which he named, including the Indian Territory; that he was resident engineer on this road, under Bond, for a time, and was then called into the office to work on estimates; that the estimates in sections completed were called "final estimates"; that he worked on the final estimate on 107, 108, and 120, which was on Turner's residency; they were marked in the office "final as to graduation"; that he went through 107, 108, and 120 on two occasions with Bond when the shovel was at work and watched it, and they blasted out a lot of material; that it was rock and could not be removed in any other way than by blasting; had seen similar material on nearly every road he had worked on, and had never known it removed except by blasting; thinks this material could not be classified as fairly by one who did not see it in its original state as by one who did; the powder would shatter; the

powder makes powder seams in the slope, and the disintegration follows; that you could approximate it by test pits sunk 20 or 25 feet from the slope, but the only fair way is to open another cut beyond the powder seams and work it out; that under the contract sued on all slate, coal, or shale which could only be removed by blasting should be classified as solid rock; thinks slate is almost invariably harder than shale or soapstone, and slate in large beds must be removed by blasting; it is the only economical way to do it.

Joseph H. Linton testifies that he was rock foreman on 107 and 108, and had charge of the blasting, and he had had 7 or 8 years' experience; describes how the blasting was done in these cuts, and says that the material could not be removed in any other way than by blasting, except as you remove marble from a quarry, and describes how that is done, and says it costs from $4 to $6 a yard; says he thinks the cut is 80 per cent solid rock, sandstone and shale; tried to drive a steel bar in that shale, but could not do it unless the material had been powder-shaken; says that the material after blasting, both sandstone and shale, were removed in the same way. This blue shale was harder than slate; usually it is not. It would take from two to four men three hours to sink a churn drill weighing 140 pounds 10 feet into this material, and that "was the same drill we used in sandstone."

S. C. Martin, vice president of the construction company, a civil engineer for 30 years, who was on the work on sections 107, 108, and 120, and saw how it was done, fully corroborates other witnesses as to the nature and character of the material; says it was blue shale, and could not have been removed except by blasting; that the question of classification was raised by him with Bond when it was being done, as early as July, 1902, and exhibits his letter to Bond on that subject; says Bond told him the estimates on section 120 would not be changed, and, relying on that, he paid Griffith a part of the retained percentage.

Turner, a civil engineer engaged in railroad work since 1897, and who was resident engineer on sections 107, 108, and 120, says that these cuts contained 7 or 8 feet of solid sandstone, and beneath that blue shale rock clear to the bottom; that he classified the material as 90 per cent solid rock, and 5 per cent each loose rock and earth; the blue shale was very hard from top to bottom; had to be shot, except possibly 150 feet at the east end of the big cut; it could not be plowed; it could only be excavated by drilling holes, filling them with powder, and blasting. "In my opinion as an engineer that was absolutely the only way this material could be excavated. Have had experience with similar material before, and it always had to be shot. This blue shale, when first uncovered, looks very much like blue granite, which comes out and is broken up in large pieces with explosives. It crumbles and looks like loose rock. It disintegrates back from the surface some little distance. This material in railroad specifications is classified as solid rock, and under the specifications in this case should be so classified. Before finally classifying this material I consulted Mr. Bond. He suggested 90 per cent. solid, 5 per cent. earth, and 5 per

cent. loose rock. I had previously classified it at a larger per cent. of loose rock than he did. I made the classifications under his directions, and he told me then the classifications were final and not approximate. The measurements and classifications were made by me under Bond's directions. I had nothing to do with the calculations as to money values." The witness says he also received directions from Bond to readjust the estimate of loose rock previously made by himself so as to raise the solid rock classification, throwing the difference of money value into solid rock. This added yardage did not, in fact, represent yardage, but was to supply a difference in classification, and was so intended. "It is the usual method in railroad work to do this when a previous value estimate has been made. This increase in classification could be arrived at in another way, but it would show a minus quantity in one of the other materials. It simply increased the solid rock quantity, but the result was the same. Mr. Bond made his estimate of this material through personal examination of the cuts. Cut 120, after it was dug, was widened and the slopes flattened, and the work was done by Griffith and a force account was allowed him in yardage. The yardage does not represent. the actual yards removed, but the value in yards. This was proper and usual. The final estimates were made by me, and I had instructions from Chief Engineer Bond to make final estimates of the work on my residency. In cuts 107 and 108 rock was broken up and used for back filling. Don't remember how the contractors were paid for this. Think it was allowed as yardage as solid rock excavation. The cost was as great as excavation."

The foregoing is in very brief form the substance of the evidence on the part of the plaintiff. The depositions are very full, and the force of this testimony is not weakened by reading the entire evidence. All this evidence is from expert witnesses except two, some of them familiar with the material in question and the others with similar material in the same section. Some of these witnesses were actually engaged by the defendant company on this very work when the railroad was constructed. With one exception they all agree that the material was shale, and all agree as to its classification as solid rock. They, experts all, agree that no such examination as Schwanecke made could be fairly made, whoever it might be made by. But in the opinion of the court, intelligent and experienced men, such as Griffith and Linton (assuming they were truthful), and who actually witnessed the work in question when being done, are just as competent and capable of forming a correct judgment as to whether the material moved could have been moved under clause 7 of the contract in this case without blasting, as any engineer, however experienced or scientific he might be. It only required common sense and experience in that class of work to know whether such material could be moved with picks, plows, or shovels, or whether it was necessary to blast it; and Griffith and Linton could tell that fact just as well as either Bond or Schwanecke or Hinckley. In view of this testimony, it seems to me that the foundation supporting the Schwanecke final estimate is completely

swept away, and the estimate itself should be disregarded, as dishonest and grossly erroneous and unjust; and the court finds that the examination on which the reclassification was made was superficial, and the estimates and classifications necessarily speculative.   Choctaw & Memphis R. R. Co. et al. v. Charles M. Newton, as Receiver of the Magoon Const. Co., supra.   I repeat, it was conceded at the trial that there was no substantial difference in the measurements made under Bond and under Schwanecke; and in the opinion of the court this testimony establishes, beyond all controversy, that the classification of this material made by Bond as solid rock was correct.   The reduction made by Schwanecke on these cuts must be restored to the contractors.   There was a slight reduction made by Schwanecke on cuts 77 and 78; the money value of such reduction being less than $30.   This, too, must be disregarded on the same grounds and as inconsequential.   The Bond estimates must be allowed to stand as made.

### Damages for Failure to Complete the Road in the Time Specified by the Contract.

At the trial it was not seriously contended that the railroad company was entitled to the 10 per cent. retained under the eighth clause of the contract as agreed compensation for failure to complete the road by May 1, 1903.   In the opinion of the court the railroad company waived this provision when the contracting parties proceeded under the provisions of the contract to construct the road after May 1st in the same manner it had done before the contract had expired.   The contract also contains a provision (marked for convenience "paragraph 42") which imposes a penalty of $100 per day as liquidated damages for each day the contractor failed to complete the contract after default.   This provision was in force, and Schwanecke in his final estimate allowed the $100 a day to the railroad company from May 1, 1903, to November 19, 1903, inclusive, and deducted the aggregate sum from the contractor's pay in his final estimate.   But it is undisputed that the railroad company began the operation of its trains from the Canadian river (indeed, from Ft. Smith, Ark.) to Guthrie, for commercial purposes, on September 20, 1903.   The construction company did, however, notwithstanding its operation by the railroad company from September 20th to November 20th, continue work on the line, perfecting the bridges by adding braces and bolts and tightening other bolts and the like—in short, making good certain deficiencies in the trestles at the time they were constructed—and were thus occupied until November 20, 1903, when the contract was finally completed.   In the opinion of the court, when, on September 20, 1903, the railroad company began operating the road for commercial purposes on the entire 120 miles covered by the contract, it waived the $100 per day liquidated damages provided for by the contract as a penalty for its noncompletion.   It was inequitable for it to take possession of the road, operate it, and take its earnings, and at the same time compel complainant to supply the deficiencies by withholding the engineer's

certificate—lose the interest on the money earned, and at the same time pay $100 penalty for the noncompletion of the road. Defendant had the right to stand on the contract and demand $100 a day until the road was completed and accepted; but it chose what it, no doubt, considered a wiser course—i. e., to operate the road and take the earnings. It did so, and in doing so the court thinks it waived the $100 per day of liquidated damages. No doubt the road lost more than $100 a day between May 1st and September 20th; but it made more, no doubt, than $100 a day between September 20th and November 20th, 1903. The $100 a day from September 20th to November 20th charged against the contractor in Schwanecke's final estimate should be restored to it.

### Extra Work by Hughes & Johnson.

Section 11 of the contract sued on is as follows:

"No charges shall be made by the contractor for hindrances or delays from any cause, in the progress of any portion of the work in this contract; but it may entitle him to an extension of the time allowed for completing the work, sufficient to compensate for the detention, the additional time to be determined by the chief engineer, provided the contractor shall give the engineer in charge immediate notice in writing of the cause of detention. Nor shall any claim for extra work be allowed, unless the same shall be done in pursuance of an order in writing from the engineer in charge, and the claim made prior to the payment of the first estimate after the execution of the work 'in question. The unloading and loading of contractor's materials will be done by the first party, and no cars will be held to exceed 24 hours from the time of their arrival at point of consignment."

The item claimed by plaintiff on account of extra work done by Hughes & Johnson was for removing parts of the embankment at the crossings of streams, so that the piles which were driven into the embankment could be sawed off and the caps placed on them. This account, the court thinks, was correctly disallowed by Schwanecke in his final estimate, for the reason that an allowance for it was covered by the second paragraph of section 30 of the specifications, which reads as follows:

"Driving piles will be paid for by the lineal foot of pile actually driven in the ground. The price for driving to include cutting off as required, and all other work necessary for receiving the cap."

And it was also properly disallowed for the reason that it was not done under the written order of the engineer in charge, nor was the claim made therefor prior to the payment of the first estimate after the completion of the work, as provided by section 11, supra.

### False Work at Canadian Bridge.

From the testimony of McNair and S. C. Martin, which is believed to be the only competent evidence with reference to the false work at the Canadian bridge, which was washed away, it clearly appears that this work was not embraced in the contract sued on. It was work ordered by Bond, chief engineer, by telegram, and also through McNair verbally, and which was done with the implied agreement that it should be paid for at cost of construction and 10 per cent. added. A force account was rendered in apt time to Bond; but it was never

allowed or acted upon by Bond, who reserved it for settlement in final estimate, with some other claims.     Schwanecke says that Mahoney swore before him that Bond told him that he did not intend to allow plaintiff for that work; and, as far as I recollect, that is substantially all the evidence on the subject. But Mahoney's evidence was not only mere hearsay, but a self-serving declaration, and therefore inadmissible.   The testimony of McNair and Martin is therefore uncontradicted.   If this false work at the Canadian bridge was not embraced in the contract, and was to be done under a separate contract by day labor at its cost and 10 per cent. added, I do not see why the construction company should be responsible for it when. it was washed away, any more than if it was being constructed when washed away by any other person under a contract of the same kind, or by the railroad company itself.   Or, on the other hand, if that was included under the head of "extra work" under the contract, then it was done under the written order of Bond and the verbal order of Otis, resident engineer, and claim put in for it in apt time, and is therefore not excluded by section 11 of the contract.   The contractor must be allowed $1,658.54 for that work.

Claim for Moving Plaintiff's Force from Weleetka to Guthrie.

Claim is also made by the plaintiff on account of the shipment of plaintiff's forces at Weleetka to Guthrie; also on account of delays occasioned by the action of the defendant in not procuring the right of way; also, for expense of overhaul of lumber occasioned by the failure of the railroad company to lay its tracks as rapidly as the grade of the road was completed, and especially in not keeping its agreement to lay its tracks both ways from Weleetka and Warwick, and in the failure to lay its track east from Guthrie; also, for the cost of additional freight on their lumber occasioned by said failure of the railroad company to comply with its agreement as to the point from which the road should be constructed; also, on account of delays occasioned by not furnishing promptly the schedules of timbers for bridges; and for other like claims, all of which are more specifically set forth in the complaint.   It may be, and I am constrained to think such is the case, that much of the delay in the completion of the road within the time provided by the contract was superinduced by the action of the engineering department. of the railroad company in making the arbitrary changes in the prosecution of the work, in delays in procuring the right of way, in tardiness in making changes of timber to go into bridges and the like, to serve the interest of the railroad company, and without due regard to the expense, annoyance, trouble, and delay of the work by the construction company.   It is doubtless true, also, that delays occurred because of the mismanagement of the construction company.   In view of the character of the chief engineer (Bond) as disclosed by this record, not only for ability, but integrity as well, it is quite likely that all these things would have been satisfactorily adjusted in his final estimate, had he lived to make it, having a conscientious regard for the substantial rights of both parties, and having himself perfect knowledge of all these matters now the subject of complaint in this respect.   All these matters were with-

in his personal knowledge and done under his directions, through his subordinates; but under the eleventh section of the contract, quoted above, claims of this character are expressly prohibited unless the parties conform to the provisions of that section. It was not done, and was therefore waived by the construction company, and no claims on these accounts can be considered now. Doubtless, in its early stages, when the work was being done, many of these things were waived, because the construction company supposed it would have ample time to complete the work; but the unprecedented rains and freshets which followed delayed and impeded them until they needed every hour of the time they could rightfully have claimed in order to complete the work. This is in a measure recognized in Mr. Dustin's letter to Mr. Bond, which has been already quoted. Whatever merit there may have been in these claims (and a court of conscience could hardly reject some of them, especially the arbitrary removal by Mr. Bond of force from Weleetka to Guthrie in order to hold the right of way against other railroad companies, and the refusal to construct the road from Weleetka and Warwick as agreed upon), courts of equity cannot make contracts, and in determining the rights of parties under contracts must be governed by them as much as courts of law.

### Interest on Balance Due the Construction Company.

Mr. Schwanecke, in his final estimate rendered March 10, 1904, allowed the construction company no interest on the balance found due it. It will be noted that there never has been any dispute between the parties as to the masonry work. The masonry work and the graduation work were both completed on the 1st of May, 1903, and the final reports of Bond as to both masonry and graduation work were both on file in his office and with one exception bearing his approval, as early as June, 1903. Copies of the measurements and classifications, with money values extended, including the money values for masonry, were sent to the construction company to be used in settling with their subcontractors as early as June, 1903. Griffith and the construction company were both notified by Bond subsequently that no alteration would be made as to measurements and classification on section 120, and the construction company settled with Griffith for part of the retained percentage after Bond notified them there would be no change. The material on 107 and 108, subsequently reclassified, was exactly the same as that in the cut on 120, and was classified and measured in the same way. Schwanecke was appointed Chief Engineer August 10, 1903. He familiarized himself with the estimates and all the correspondence within a few weeks after his appointment, and prosecuted the bridge work to completion, so that the road went into operation for commercial purposes on September 20, 1903. Nothing then remained for the construction company to do but to complete some inconsequential deficiencies in the bridges, as hereinbefore stated, and that work was completed November 20, 1903, and no dispute grew out of the work on the bridges, either under Bond or Schwanecke. If follows that the railroad company then had from May 1st to November 20th to make any remeasurements and reclassifications it might see fit. Bond, up to his death in July, had clearly stated that none would

be made, and the railroad company and Schwanecke took no steps to reclassify sections 107, 108, and 120 until the latter part of December, nearly 20 days after the railroad company was sued for a settlement, and 6 months after the graduation work was completed and classified, and then occupied from December until March, 1904, nearly 3 months more, in the work of reclassification.

Can anybody say that this conduct on the part of the railroad company and its engineer was fair, honest, and conscientious? If sections 107, 108, and 120 were to be remeasured and reclassified, why was it not done in August, 1903, as soon as Mr. Mahoney informed Mr. Schwanecke he was dissatisfied with the classification of those sections, if, indeed, it is true he ever told him so at all? The remeasurements and reclassifications of 107, 108, and 120 could in no possible way interfere with the bridge building or with the force engaged therein. Both classes of work, as is usual, might have progressed at the same time. If Mahoney did not tell Schwanecke in August that he was dissatisfied with the classification of those sections, and reclassification and remeasurement was determined upon in October, as Schwanecke says it was, why did he not do it then, before the work under the contract was completed? Why did he wait till Christmas, long after the company was sued, to make the remeasurement necessary to reclassify? I cannot reconcile this conduct consistently with good faith and honest purpose. It is the opinion of the court, based on all the facts, that this reclassification of 107, 108, and 120 was an afterthought, conceived after suit was brought, in pursuance of a settled policy to force a settlement upon terms acceptable to the railroad company. I am persuaded that if Schwanecke had desired to do his duty on the 20th of November, when the work was completed, and when he says he knew it was completed, that he would on that day, as the contract required, have issued the certificate that the work was completed, and given it to the construction company, and that he could within three weeks from that day have easily had his final estimate ready. He had nothing to do, so far as the masonry and graduation work was concerned, except to examine Bond's estimates. He had Bond's office and office force at his disposal to give him aid and information. There was no contest over the masonry or bridge work. It required but little time to pass on even the few items now in dispute, for these items all originated under Bond's administration and the facts were familiar to the office force and the officers of the road. Indeed, there is no substantial conflict in the evidence now about any of the disputed items, except as to the cause of delays in the completion of the work—delays brought about by changes in the bridges, delays occasioned by the arbitrary removal of the contractor's forces from Weleetka to Guthrie, delays occasioned by the nonprocurement of the right of way, and matters of that kind, all excluded by the terms of the contract. What reasonable excuse can be rendered for the unusual delay, and arbitrary, vexatious, and oppressive course pursued by Schwanecke except, as indicated by the letters already set out, to force a settlement? It is my deliberate judgment that there was none.

It was contended that interest should run from September 20, 1903,

when the operation of the road began, or certainly from November 20, 1903, when the road was completed in full. But unfortunately both contentions are untenable, because the parties in the thirteenth section of the contract expressly waived suits of all kinds until the final estimate was made. Interest could not run until suit could be brought. The contract provided no time in which an estimate should be made, but the law required it should be done in a reasonable time after the work was completed. It was not done. I think the delay was dishonest and fraudulent, and interest should begin to run on the balance due from December 15, 1903, at 6 per cent., by which date Schwanecke could easily have made out his final estimate.

I have concluded that I can restate this case without the assistance of a master.

### Statement of Account by the Court.

| | | | |
|---|---|---:|---:|
| Value of work done by Fruin-Bambrick Construction Company at the time Schwanecke was appointed chief engineer as shown by Schwanecke's August estimate, marked "(a) J. H. R.," in evidence...... | | | $1,156,648 58 |
| Value of work done in September, 1903, as shown by Schwanecke's September estimate, marked "(b) J. H. R.," on file as evidence ........................ | | $7,058 04 | |
| Value of work done in October, 1903, as shown by Schwanecke's October estimate, marked "(c) J. H. R.".................. | | 1,061 06 | |
| Value of work done in November, obtained by deducting timber and iron found in the October estimate of Schwanecke from the timber and iron found in Schwanecke's final estimate .... ............ .... | | 2,845 68 | 10,964 78 |
| Balance due construction company, based on Bond's estimate before it was revised by Schwanecke, and on Schwanecke's estimates for September, October, and November ............ ... .... ... | | | $1,167,613 36 |
| Timber furnished construction company, shown in fourth article of Schwanecke's final estimate ...................... | $2 238 62 | | |
| Labor by railroad company for construction company, as shown in fourth article of Schwanecke's final estimate............. | 131 00 | $2,369 62 | |
| Timber furnished railroad company by construction company, as shown in fourth article of Schwanecke's final estimate .. | $1,658 54 | | |
| Extra bills shown in same estimate....... | 155 41 | 1,813 95 | |
| Balance due railroad company.......... . | | $ 555 67 | |
| Amount advanced by railroad company to construction company on lumber not in place, as shown by notation on Schwanecke's September estimate ............ | | $ 15,866 67 | |
| Previous payments as shown by Schwanecke's final estimate .. ........ . .... | | 1,040,983 72 | $1,057,406 06 |
| Balance due construction company........ | | | $ 110,207 30 |

| | |
|---|---:|
| Amount brought forward................... | $  110,207  30 |
| Add amount allowed by court for false work on Canadian bridge................ | 1,658  80 |
| Total ........................... | $  111,866  10 |
| Deduct $100.00 per day from May 1, 1903, to September 19, 1903, inclusive, 142 days | 14,200  00 |
| Balance due construction company........ | $   97,666  10 |
| Add interest from December 15, 1903, to September 11, 1905, 1 year, 8 months, and 26 days, at 6 per cent. ................. | 10,189  70 |
| Total balance due construction company September 11, 1905, ............. ...... | $  107,855  80 |

This statement allows Bond's estimates to stand as they existed when Schwanecke was appointed, and Schwanecke's estimates to stand as to work done under him as he subsequently made them, and it adds the extra work on the false trestle on the Canadian bridge; it deducts the allowance of $100 per day from September 20th to November 20th allowed by Schwanecke; and it allows interest to the construction company on the balance found due at 6 per cent. from December 15, 1903, to September 11, 1905.

It appears from Schwanecke's final estimate that there were outstanding claim against the construction company for nearly $25,000, which the railroad company under the contract have a right to have paid out of these funds due the construction company. The judgment will go for $107,855.80, and an order will be made that $30,-000 of that sum be paid into court, and all persons having claims against the construction company will be allowed to intervene within 60 days and prove their claims, during which time the construction company may have leave to file acquittances from any one or more of the creditors named in Schwanecke's final estimate, and thereupon withdraw such funds on the order of the court as they shall file acquittances for; and the court will retain jurisdiction of the case for the purposes aforesaid.

### On Motion to Reopen Case.

Since the written opinion in this case was handed down a motion to reopen the case has been filed, based upon certain alleged errors in the computation made by the court in stating the account between the parties. The grounds for the motion for the correction of the account having been argued and considered, the court thinks they are without merit. The 4,000 yards of solid rock added by Turner, under direction of Bond, then chief engineer, was not intended to add yardage to the measurement made by Turner of the cuts made on sections 107 and 108, but was intended to correct the classification of the material found in those sections. It was a mere method of reclassifying the material, to avoid carrying through the accounts minus quantities, and did not in any sense affect the results, either for or against the railroad company. Of course, this statement proceeds upon the theory that Bond's classifications were correct, which the court has found was the case.

Counsel have also attached certain letters to their motion, intended,

no doubt, to show that the court had drawn unfavorable inferences from a certain letter of Schwanecke, which tended to reflect upon Dustin, the president of the railroad. The inferences complained of, it is insisted, were drawn from the letter of November 22, 1903, which letter is as follows:

"Fort Smith, Nov. 22nd, 1903.

"A. C. Dustin, Esq., Prest., Cleveland, Ohio—Dear Sir. Your favor of the 19th inst., with inclosures as stated, is at hand, on my return from the road. Our position is quite correct, while he is all wrong I really don't see what the man means. He says all of our engineers will testify for him. It seems our engineers had more of the contractor's welfare at heart than the company who employed them. I expect you and I will have to fight it out without the co-operation of any one else. The iron bridges are completed, it is reported, and I go out on line Tuesday to look at them. Also to see whether the full tying and spiking is completed from Folsom 14 miles west.

"Yours respectfully,          H. A. Schwanecke,          Engineer."

When the case was tried the other letters attached to the motion, both dated November 19, 1903, were not in evidence. An order had been made requiring Dustin and Schwanecke to file all their correspondence in the clerk's office for inspection by the plaintiff. They did not file these two letters of November 19, 1903, and the court's attention was not called to them, nor was any complaint made that they were not filed. Of course, the court did not consider them, for they were no part of the record; nor was it plaintiff's fault that they had not filed them. They were a part of the very correspondence that Dustin and Schwanecke had been ordered to file, and which they failed to file. The two letters are as follows.

"Nov. 19th, 1903.

"Mr. H. A. Schwanecke, C. E., Fort Smith, Ark.—Dear Sir: I am just in receipt of your message reading: 'Swift here on warpath. Says he will file a lien and commence suit at once and wait on no estimate. Mahoney expected back today.' To which I replied as follows: 'Your message. *Copy my letter Swift 13th states clearly my position.* Tell Swift we propose comply strictly with contract. Will even make partial payment advance final estimate if they will reasonably adjust matters mentioned in letter. Have no objections to his putting on lien and starting suit if he thinks his position will be improved by such course.' Mr. Swift is at liberty, 'if he so desires, to put on a lien. This would not delay nor expedite in any way the final settlement, which would, even under such circumstances, be promptly made as soon as we know how much we owe him. If he should bring suit, he would not receive final settlement until the court had determined to how much he was entitled. Had Mr. Swift displayed the same energy when he was holding us up at the Canadian river that he now seems to possess, none of this trouble would have arisen. Enclosed I hand you copy of letter I have just written Mr. Swift.

"Very truly yours,          A. C. Dustin,          President."

"Nov. 19th, 1903.

"Mr. W. H. Swift, President Fruin-Bambrick Construction Company, St. Louis, Mo.—Dear Sir: I am to-day in receipt of a telegram from the chief engineer of this company to the effect that you are in Fort Smith and have threatened to file a lien and commence suit at once unless payment is made to you, and that you do not propose to wait for final estimate. I have wired Mr. Schwanecke in reply that we propose to comply strictly with our contract, that we will even make partial payment in advance of the final estimate, if you *will reasonably adjust the matters mentioned in my letter to you of the 13th inst.* I have further informed Mr. Schwanecke that I had no objections to your putting a lien and starting suit if you thought your position would be improved by such a course. The attitude of your company, from the very inception of its work on our line, has been very strange indeed.

You had ample time to have finished your work and to have complied with the contract. In reliance on the contract being performed, we provided, as you know, hundreds of thousands of ties, and from ten to twelve thousand tons of rails. These laid alongside the railroad until it suited your convenience to permit us to lay them, and while your contract called for your work to be completed by May 1st, 1903, latest reports would indicate that you are not yet through with the work. I may be wrong about this last, and possibly you have now actually finished. *On my last trip to Fort Smith I discovered some very strange things in connection with your work, which the engineer was requested to investigate. As soon as he has remeasured certain portions of your work he will be ready to give a final estimate, and if we can adjust reasonably the damages due us, growing out of your delay, payment will be made to you for whatever may be then owing to you.* Your threat to put a lien on our property at this time, and threat to start suit immediately, does not frighten me, nor help your case one particle. On the contrary, if anything, in view of the fact that you have ninety days in which to put on your lien and one year thereafter in which to bring suit, indicates that your attitude is vindictive and hostile. All I want is a fair settlement under the contract. If this is what you want, there is no occasion for any litigation. If, however, you do not want a fair settlement, I suppose there will be nothing to do but let the courts decide how much is due the one or the other under the contract. As above stated, while I do not court it, I have no fear whatever of a lawsuit.

"Very truly yours,     A. C. Dustin,     President."
(The italics are mine.)

It will be observed that neither of these letters furnished any predicate for the contents of Schwanecke's letter of November 22, 1903, supra; but there is a very significant reference in both of these letters, which goes to confirm in the strongest way the correctness of the court's conclusions in the original opinion to the effect that the reclassification of the material in sections 107 and 108 was an afterthought of Schwanecke's and intended by him to promote such a settlement as would, in his opinion, meet the views of Dustin. He refers to the letter of Dustin to Swift, dated November 13, 1903, which letter is as follows:

"November 13th, 1903.

"Mr. W. H. Swift, Fruin-Bambrick Construction Company, St. Louis, Mo.—Dear Sir: Your favor of the 11th inst. is received. I expected to have gone to Fort Smith before this, but various matters have detained me here, and I shall not now go down there until after Thanksgiving day. I plan, at that time, to spend considerable time there. *Regarding your contract, I have to say that owing to your failure to complete your work in time agreed we sustained a very large amount of damage. I am also informed that on several of the sections yardage was improperly computed in the partial estimates, which will need to be rectified.* Our actual damages are nearly as large as your claim, but it is possible that we have no right to ask more than the amount liquidated in the contract; but so far as the excess yardage is concerned, which was improperly added, we expect that to be rectified. If we can agree on a basis for the adjustment of these matters, I shall be very glad to make you a reasonable payment. If, however, you dispute your liability for these, I see no other way to do than to wait until our engineer has completed his surveys and is able to figure definitely the amount due under the contract. When the engineer has completed this work, I shall be very glad to take this matter up in a fair and equitable way for final adjustment.

"Very truly yours,     A. C. Dustin,     President."
(Italics mine.)

This letter was in evidence; but its significance was overlooked by the court. Its significance is now brought out by the reference to it in the letters of November 19, 1903, supra, and by this letter it is made

to appear that the dispute on November 19th and November 22d was not about "classification" at all, but about "yardage." The court reached that conclusion without this letter, as the original opinion will show. Two matters, this letter says, were at that time in dispute: first, damages for failure to complete the work in time; and, second, improperly computed yardage found in the partial estimates on certain sections. We find nowhere in the whole record a single word about improper classification until later, and after an effort to adjust differences had failed and suit had been brought. Then it was that steps were taken to remeasure and reclassify; and this did not begin until about six weeks after Dustin's letter to Swift of November 13, 1903, was written. That this is absolutely true is shown by Schwanecke's letter of November 6, 1903 (found in the opinion of the court), when he informs Dustin that he is then (on November 6, 1903) "measuring sections in accordance with his [Mahoney's] suggestions, as directed by you [Dustin] when here last," and adds, "I think you are on the right track to get a settlement, and will keep you advised." Evidently the measurements were being made to get the correct yardage, which is the very complaint made by Dustin to Swift seven days later, in his letter of November 13, 1903, supra. Thus it is made .apparent, and I think conclusive, that the matter of reclassification was an afterthought of Schwanecke's to get a settlement for Dustin, for he had already notified Dustin, on November 6th, when he was measuring to get at the yardage, that he thought that he (Dustin) was on the right track to get a settlement. He failed to discover any substantial discrepancy in the yardage, and this reclassification was the next step to reach the desired result—a settlement.

I have read and re-read the original opinion, and I find no inference drawn from this letter of November 22, 1903, which reflected on Dustin. The language, "Our position is quite correct, while he [Swift] is all wrong," evidently alludes to Dustin's claim, stated in his letter to Swift dated November 13, 1903, in which he claimed damages for not completing the work in time, and the correction of certain alleged errors in the computations of yardage. No doubt Dustin thought he was correct in these things; no doubt Schwanecke had so made him believe; but they were both wrong, except as to the claim for damages for not completing the work in time. As to Dustin there was nothing dishonorable in that; and it is the only part of the letter from which any inference could be drawn against Dustin. The paragraph of the letter which follows relates to the interview between Schwanecke and Swift, and was information imparted to Dustin by Schwanecke. The real error into which Dustin fell was in supposing that it was proper for him to direct Schwanecke what he (Schwanecke) should do or should not do in adjusting the differences between the parties under the terms of the contract. Schwanecke should have been left free to exercise an unbiased judgment in that regard. Whether he was influenced by Dustin, or whether to promote his own interests he was slavishly doing what he thought would please Dustin, the court has not felt called on to decide, and is immaterial in the view the court takes of the case; for, if not influenced by Dustin's letters and conferences (which appear in the record), then so much the worse for

Schwanecke, for then his conduct discloses a total misconception of what his position demanded and his duty required, for his letters show that without accurate information and before his measurements were completed he prejudged the issues, and notified Dustin that he was on the right track to get a settlement, and when his measurements failed to bear him out as to the amount of yardage he sought to retrieve by a reclassification, based on an ex parte examination of the most superficial and unsatisfactory character, and then determined the issues in favor of the company, and notified Dustin accordingly of the result, before giving the construction company a chance to be heard, or notifying them what he was engaged in. Such conduct shows a want of conscience on the part of Schwanecke that was reprehensible in the highest degree.